# TENNESSEE *v.* VIRGINIA.

ORIGINAL.   IN EQUITY.

No. 6.   Submitted May 18, 1903.—Decided June 1, 1903.

Report of commissioners appointed to ascertain, retrace, re-mark, and re-establish the real, certain and true boundary line between the States of Tennessee and Virginia from White Top Mountain to Cumberland Gap confirmed.

A compact having been entered into by the States of Tennessee and Virginia expressed in concurrent laws of said States which received the consent of Congress, this court modifies the line delineated in the report of the commissioners as to so much thereof as is affected thereby, and that portion of the line is determined, fixed and established in accordance with such compact.

The commissioners having ascertained and recommended the straight line from the end of the "diamond-marked" compact line of 1801–1803 to the corner of the States of North Carolina and Tennessee as the true boundary line between the States of Virginia and Tennessee between those two points, this court approves and adopts such recommendation.

THE proceedings appear in the decree of the court.

*Mr. Charles T. Cates, Jr.,* attorney general of the State of Tennessee, for complainant.

*Mr. William A. Anderson,* attorney general of the State of Virginia, for defendant.

MR. CHIEF JUSTICE FULLER announced the decree of the court.

This cause came on to be heard on May 18, 1903, on the proceedings heretofore had herein, and upon the report of William C. Hodgkins, James B. Baylor and Andrew H. Buchanan, commissioners appointed by the decretal order herein of April 30, 1900, to ascertain, retrace, re-mark and reëstablish the real, certain and true boundary line between the States of Tennessee and Virginia, as actually run and located from White Top Mountain to Cumberland Gap, under proceedings had between

the two States in 1801–1803, and as adjudged and decreed by this court in its decree of April 3, 1893, in a certain original case in equity, wherein the State of Virginia was complainant and the State of Tennessee was defendant; which report is annexed hereto and made part hereof.

And it appearing to the court that said report was filed in this court on the 5th day of January, 1903, and that the same is unexcepted to by either party in any respect; therefore, upon the motion of the State of Tennessee, by her Attorney General, and of the State of Virginia, by her Attorney General, it is ordered that said report be, and the same is hereby, in all things confirmed.

It is thereupon ordered, adjudged and decreed that the real, certain and true boundary line between the States of Tennessee and Virginia, as actually run and located under the compact and proceedings had between the two States in 1801–1803, and as adjudged by this court on the third day of April, 1893, in said original cause in equity, wherein the State of Virginia was complainant and the State of Tennessee was defendant as aforesaid, was at the institution of this suit, and now is, except as hereinafter shown, as described and delineated in said report filed herein on January 5, 1903, as aforesaid.

And it further appearing to the court, and it being so admitted by both parties, that since the institution of this suit and the decretal order of April 30, 1900, as aforesaid, a compact was entered into by the States of Tennessee and Virginia, expressed in the concurrent laws of said States, namely, the act of the general assembly of Tennessee, approved January 28, 1901, entitled "An act to cede to the State of Virginia a certain narrow strip of territory belonging to the State of Tennessee, lying between the northern boundary line of the city of Bristol, in the county of Sullivan, and the southern boundary line of the city of Bristol, in the county of Washington, State of Virginia, being the northern half of Main street, of the said two cities," and the reciprocal act of the general assembly of Virginia approved February 9, 1901, entitled "An act to accept the cession by the State of Tennessee to the State of Virginia, of a certain narrow strip of territory claimed as belonging to

the State of Tennessee, and described as lying between the northern boundary line of the city of Bristol, in the county of Sullivan, State of Tennessee, and the southern boundary line of the city of Bristol, in the county of Washington, State of Virginia, being the northern half of the Main street of the said two cities."

And it further appearing that said compact received the consent of the Congress of the United States by joint resolution approved March 3, 1901, as follows:

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That a recent compact or agreement having been made by and between the States of Tennessee and Virginia, whereby the State of Tennessee, by an act of its legislature approved January twenty-eighth, nineteen hundred and one, ceded to the State of Virginia certain territory specifically described in said act and being the northern half of the main street between the cities of Bristol, Virginia, and Bristol, Tennessee, and the State of Virginia, by act of its general assembly, approved February ninth, nineteen hundred and one, having accepted said cession of the State of Tennessee, the consent of Congress is hereby given to said contract or agreement between said States fixing the boundary line between said States as shown by said acts referred to, and the same is hereby ratified."

And said commissioners, in their said report, having ascertained and recommended the straight line from the end of the "diamond-marked" or compact line of 1801–1803 to the corner of the States of North Carolina and Tennessee as the true boundary line between the States of Virginia and Tennessee between those two points, the court, approving said recommendation and finding of said commissioners, doth adopt the same.

And the court, being of opinion that it is proper to recognize the line so established by said last-mentioned compact of 1901 as the real, certain, and true interstate boundary line within and between said two cities, and to definitely determine and fix in this cause what is the real, true and certain boundary line between said States throughout the entire length thereof

from the corner of the States of North Carolina and Tennessee, on Pond Mountain, to the corner of Virginia and Kentucky, at Cumberland Gap, doth therefore adjudge, order, and decree that the entire real, certain, and true boundary line between the States of Tennessee and Virginia is the line described and delineated in said report filed herein on January 5, 1903, modified as to so much of said line as lies between the two cities of Bristol, by the aforesaid compact of 1901 between the two States, and as so described, delineated, and modified said boundary line from the said North Carolina corner to the eastern end of the compact line of 1801–1803, known as the "diamond-marked" line, and thence to Cumberland Gap, is hereby determined, fixed, and established.

It is further ordered, adjudged and decreed that the compensation and expenses of the commissioners and the expenditures attendant upon the discharge of their duties be, and they are hereby, allowed at the several sums set forth in their report, as hereinbefore confirmed, and that said charges and expenses, together with all the costs of this suit to be taxed, be equally divided between the parties hereto.

It is further ordered that the clerk of this court do, at the proper charges of the parties to this cause, deliver fifty printed copies of this decree including said report to the Attorney General of each of said States.

The report of the commissioners, filed January 5, 1903, is as follows:

*To the Honorable the Chief Justice and Associate Justices of the Supreme Court of the United States:*

Your commissioners, appointed by the decree of this honorable court, dated April 30, 1900, to ascertain, retrace, re-mark and reëstablish the boundary line established between the States of Virginia and Tennessee, by the compact of 1803, which was actually run and located under proceedings had by the two States in 1801–1803, and was then marked with five chops in the shape of a diamond, and which ran from White Top Mountain to Cumberland Gap, respectfully represent that they have completed the duties assigned to them by the said

decree of April 30, 1900, that they have retraced and re-marked the said boundary line as originally run and marked with five chops in the shape of a diamond in the year 1802, and that for the better securing of the same they have placed upon the said line, besides other durable marks, monuments of cut limestone, four and a half feet long and seven inches square on top, with V's cut on their north faces and T's on their south faces, set three and a half feet in the ground, conveniently located as hereinafter more fully described, so that the citizens of each State and others, by reasonable diligence, may readily find the true location of said boundary ; all of which is more particularly set forth in the detailed report of their operations, which your commissioners herewith beg to submit, together with two maps explanatory of the same, a list of the several permanent monuments and other durable marks, and a complete bill of costs and charges. And your commissioners further pray that this honorable court accept and confirm this report ; that the line as marked on the ground by said commissioners in the years 1901 and 1902 be declared to be the real, certain and true boundary between the States of Tennessee and Virginia ; that your commissioners be allowed their expenses and reasonable charges for their own services in these premises, as shown on the bill of costs which forms a part of this report ; and finally, that your commissioners be discharged from further proceedings in these premises.

　　　　　　　WILLIAM C. HODGKINS,　　[SEAL.]
　　　　　　　　　　　*Commissioner.*
　　　　　　　JAMES B. BAYLOR,　　[SEAL.]
　　　　　　　　　　　*Commissioner.*
　　　　　　　ANDREW H. BUCHANAN,　　[SEAL.]
　　　　　　　　　　　*Commissioner.*

Detailed report of the operations of the commission appointed by the Supreme Court of the United States, April 30, 1900, to retrace and re-mark the boundary line between the States of Tennessee and Virginia.

At the date of the above decree and for several months thereafter the State of Virginia had no funds available for the pro-

ceedings ordered by the court, and none could be had until there could be a session of the state legislature to make the needed appropriation. It was therefore necessary for your commissioners to seek an extension of the time within which they might make their report and upon the motion of the Attorney General of Virginia an extension was granted until the next term of court.

At a session of the General Assembly of Virginia, held in the winter of 1900–1901, the sum of five thousand dollars was appropriated for the purpose of paying Virginia's share of the expenses of this boundary survey.

The Tennessee legislature had previously made a like appropriation.

Your commissioners therefore made preparations for beginning the execution of their duties under your decree of April 30, 1900, as early in the season of 1901 as the weather conditions should permit.

The commission held its first meeting at Washington, D. C., on May 16, 1901, and organized by choosing William C. Hodgkins, of the State of Massachusetts, as chairman; James B. Baylor, of the State of Virginia, as secretary, and Andrew H. Buchanan, of the State of Tennessee, as treasurer.

At this meeting there was a full discussion of the problem presented and of the method of work which might be most suitable under all the conditions. Arrangements were also made for procuring the necessary camp outfit and supplies.

Through the courtesy of the Superintendent of the U. S. Coast and Goedetic Survey, your commissioners were able to procure from that bureau, without charge, not only the outfit of tents and camp furniture required for the shelter and comfort of the party, but also the valuable instruments needed for the survey.

This relieved the States of Tennessee and Virginia of a considerable expense which would otherwise have been unavoidable. The two States were spared another heavy item of expense by the fact that each of your commissioners is a civil engineer and entirely familiar with work of this nature. It was, therefore, unnecessary to follow the usual course of em-

ploying engineers or surveyors to carry out the field-work under the direction of the commissioners. Instead of that, your commissioners themselves conducted all the field-work, hiring only such rodmen, axemen, etc., as were necessary from time to time. By such methods and by exercising rigid economy in all of their expenditures, your commissioners have been able to complete the entire work, including the setting of cut-stone monuments, and also including the amount charged for their own remuneration, for the sum of $9475.99, which is but little more than the amount charged to the State of Virginia alone by the joint commission of 1858–1859.

It having been decided at the first meeting of the commission that the most convenient place for beginning field operations would be the city of Bristol, which is located directly upon the boundary line, the commission adjourned to that place.

Field-work was begun on May 22, 1901, with the examination of a portion of the line east of Bristol, where a number of trees were found which bore the marks of the surveys of 1802 and 1858–'59. As there has been considerable controversy and conflicting testimony in regard to the nature of these old marks, it may be well to show by diagrams and photographs the actual arrangement and appearance of those of both years, as well as of the somewhat different mark which was used for the present re-marking by your commissioners.

1802.                1859.                1902.

While the marks made in 1858–'59 are still numerous in forested areas and are generally easily distinguishable, those made in 1802 are becoming scarce and sometimes are barely discernible when found.

This is shown in the accompanying photograph of a large white oak tree, upon which the marks of 1858–'59 can readily be traced, while only three of those made in 1802 can be distinguished and those with difficulty. The marks of 1802 were apparently made with a small and light hatchet and on many trees which have a thick and rough bark the hatchet does not seem to have reached the wood and in such cases the gradual exfoliation of the bark has often nearly or entirely obliterated the mark. Where the wood was wounded a small burr has formed which can nearly always be recognized, but cuts which did not completely penetrate the bark have sometimes disappeared.

The marks left by the survey of 1858–'59 were found of very great value as guides to the older "diamond" marks of 1802. Both marks were often found on the same tree and it was a rare occurrence to find the diamond mark without the mark of 1859, either above or below it. In fact, it was very soon noticed that the mere fact of finding the mark of 1858–'59 either above or below the normal position on a tree was an almost certain indication that a diamond mark had been found there at the date of the later marking, even though, through the action of time and the elements, all vestiges of it may now have disappeared. Since the date of the last survey, very many marked trees have been destroyed through various agencies, especially since the more rapid development of this section in recent years has caused a greater demand for lumber, and in some places the trees bearing the old marks are so far apart and the marks themselves are so faint that great trouble and delay would often have been experienced in the search for these old marks had it not been for the aid afforded by the marks of 1858–'59, which always proved reliable guides by which to find the older marks.

In this connection it may not be inappropriate for your commissioners to state that they everywhere found that the joint commission of 1859 did its work in a careful and conscientious manner, and that they believe its line, as marked on the growing timber, is identical with that marked by the joint commis-

sion of 1802, and that full credence should be given to state-ments of fact in the report of that survey.

From a point about a mile and a quarter east-of Bristol, the line was traced without difficulty, other than that due to the broken nature of the country traversed, as far as the beginning of what is commonly known as the Denton Valley offset.

At this point occurs the greatest and most remarkable irreg-ularity in the whole course of this line, there being a deflection from the direct course of 66° 10′ for a distance of 8715.6 feet. The portion of the boundary east of the offset is further north than that west of the offset, so that the deflection is to the south in going westward from the eastern end of the line, the direc-tion in which it was originally run out, or to the north in work-ing eastward from Bristol, as was done in the present survey for reasons of convenience. In either case, the deflection is to the left hand; but it is not the same in each case, as the two portions of the line east and west of the offset are not exactly parallel to each other. This difference of direction amounts to 1° 30′ as shown on the map of the line accompanying this re-port.

Owing to the long controversy over this offset and the per-sistent assertions of certain parties that marked timber would be found on the eastern prolongation of the portion of the line ex-tending from Bristol to Denton's Valley, if the same were run out, your commissioner felt obliged, in order to settle the ques-tion for all time, to run out this line and make a careful search for marked timber along its course. This was accordingly done, and a careful examination of the timber on each side of the transit line was made as the work progressed; but with only negative results.

Although several weeks were spent in running this line across the series of very rough and heavily timbered mountains lying between Denton's Valley and Pond Mountain, near the corner of North Carolina, and although every story brought to the commissioners by people interested in the result was carefully examined, your commissioners were utterly unable to find or to have pointed out to them one authentic mark of the line of 1802, either on this line or anywhere in its vicinity.

On the other hand, the "offset line" and the portion of the line running eastward from the offset to the vicinity of the White Top Mountain were found well marked; both the 1802 and the 1858–'59 marks were found at frequent intervals.

In order to be assured that these marks were authentic, blocks were cut from several of these trees, at different points on said offset line, and the ages of the marks were determined by counting the rings of the annual growth. These tests showed that the marks were of the supposed age. The ages of the most important marks were verified by the U. S. Bureau of Forestry. As was found in 1858–'59 the marking of the timber ceased (or began) on a comparatively low eminence, known as Burnt Hill, which from the neighboring heights of White Top or of Pond Mountain seems to be in the bottom of a hollow.

The apparent discrepancy between this situation and the language of the report of the joint commission of 1802, which reads —"Beginning on the summit of the mountain generally known as the White Top Mountain," etc., has led some to suppose that the line should be extended further east, to the summit of the so-called " divide" or watershed between the tributaries of the Holston and New Rivers.

There seems, however, nothing to support this theory except the somewhat hazy idea that the eastern end or point of beginning of this line ought to be on a summit.

As a matter of fact, the actual end of the line on Burnt Hill is on quite as much of a summit as if it had been on the " divide," which in this place is so low and flat as to be scarcely perceptible as an elevation of any importance. It certainly could never be supposed to be the summit of White Top Mountain, which towers far above it, its huge, dome-like bulk filling the northeastern horizon.

No marked trees of 1802 or of 1858–'59 could be found east of Burnt Hill, though the line was produced through heavy timber of original growth to the " divide" and careful search was made for them. The same condition was found in 1859, as reported by the commission of that year. A point which that commission seems to have overlooked is the important fact that the eastern end of the marked line at Burnt Hill is almost

exactly in line between the corner of North Carolina, on Pond Mountain, and the summit of White Top Mountain. What more likely than that the commissioners of 1802, who agreed to lay out a line equally distant from the older lines, known as Walker's and Henderson's and beginning on the summit of the mountain generally known as the White Top Mountain, should begin at the point where the Walker line reached the northwestern corner of North Carolina, and where accordingly the jurisdiction of Tennessee should begin, and run thence in the direction of the most important peak to the northward and eastward until they reached the desired middle point between the lines of Walker and Henderson, and from that point started on their westerly course. It is hard to understand why they should have omitted to mark this part of their line; but this small bit of boundary, extending from the northeast corner of Tennessee to the northwest corner of North Carolina, seems to have been somewhat overlooked in more recent proceedings. Your commissioners respectfully recommend that the straight line between these two points be declared to be the boundary, believing, as they do in the absence of any marks to the contrary, that this was the original and true line. All of this section is composed of very rugged and densely wooded mountains with but a scanty population.

The progress of the work in this mountainous and almost inaccessible region was delayed not only by the nature of the country and by the fact that in this very worst part of the whole line it was necessary to run out these two independent lines, doubling the labor to be expended, but also by the unfortunately rainy weather which was experienced. The frequent and heavy rains often stopped field-work, washed the few roads so badly that they became almost impassible and raised the streams so high that sometimes for days at a time it was impossible to ford them.

It was not until September 21 that your commissioners were able to close work in the White Top region and return to Bristol to start westward from that place toward Cumberland Gap.

For the remainder of the season, however, both the weather and the nature of the country were much more favorable for

field operations and excellent progress was made, though it was impossible to entirely complete the work before the approach of winter.

So far as the portion of the boundary passing through the central part of the city of Bristol is concerned, the labors of your commissioners were forestalled by a special act of the General Assembly of the State of Tennessee, approved January twenty-eighth, nineteen hundred and one, ceding to the State of Virginia the northern half of the main street of the two cities. The General Assembly of Virginia accepted the cession by an act approved February ninth, nineteen hundred and one, and the action of the two legislatures was subsequently ratified by the Congress and approved by the President of the United States, March third, nineteen hundred and one. This cession covers, however, but a small part of the boundary, extending only from the northwest corner of the old town of Bristol on the west to the western boundary of the Bristol cemetery on the east. As it is important to guard against the possible renewal of this long-standing controversy, and as the town is already extending beyond the above limits, it was deemed proper to mark the old diamond line by monuments, just as if there had been no legal change in the boundary for this short distance. But your commissioners regret to report that they have been unable to reach a unanimous conclusion in regard to the true location of the said diamond line within and near the above limits.

Commissioners Hodgkins and Buchanan, after careful study of all the evidence of record and after diligent examination of the ground, are of the opinion that the said diamond line of 1802–1803 runs from monument No. 25, near the first marked tree east of Bristol, in a straight line, to monument No. 26, on the western boundary of the Bristol cemetery and on the north line of Main or State street ; thence along the northern line of said Main or State street to " a planted stone in the edge of a field formerly owned by Z. L. Burson, being the northwest corner of the corporate territory of the old town of Bristol," referred to in the act of cession, *supra;* and thence in a straight

line to monument. No. 28 in the fork of the main road and near the first marked trees west of Bristol.

Commissioner Baylor, on the other hand, after equally careful consideration of all the evidence of record and diligent examination of the ground, is of the opinion that the said diamond line of 1802–1803 runs from monument No. 25, near the first marked tree east of Bristol, in a straight line to monument No. 27, situated just outside of the wall of the Bristol cemetery and on the middle line of Main or State street as it runs west from this point; and thence in a straight line along the middle of Main or State street to monument No. 28, near the center of the fork of the main road, and near the first marked trees of 1858–'59, west of Bristol.

The said line, running through the center of Main or State street, is just 30 feet south of monument No. 26 on the north property line of Main or State street, outside the western wall of Bristol cemetery.

Westward from Bristol, the boundary was retraced without difficulty by the marked trees, just as in the previous work to the eastward.

Only one marked deviation from the general course of the line was encountered during the remainder of the season. This was on the property formerly known as the Hickman place, in the vicinity of the village of Bloomingdale, Tennessee.

Here the line was found to have a deflection of 8° 30' to the right, or north, for the distance of 3161.8 feet. From the western end of this offset, the line resumed its general westerly course, and so continued until the end of the work of that year. As the season advanced, it became evident that even under the most favorable conditions it would be impossible to complete the survey without working far into the winter, which on many accounts was undesirable.

The Attorneys General of the two States therefore joined in a request for a further extension of time within which your commissioners might file their report, and this honorable court thereupon extended that time until the opening of the October term, 1902.

The field operations for the season of 1901 were closed at the

end of October, at which time the survey had been extended to the Clinch River, 43 miles east of Cumberland Gap the total length of boundary retraced being 70 miles, besides 16 miles of trail line run on the extension of the "straight line" from Denton's Valley to Pond Mountain.

Before the opening of field-work for the season—1902, a complaint reached your commissioners from a citizen of Johnson County, Tennessee, supposed to be reliable, to the effect that interested parties were interfering with the marks placed on the line the previous year, and that in some cases at least the monuments had not been properly placed by the persons employed for that purpose.

Although these statements seem scarcely credible, in view of the general interest taken in the work by the inhabitants, your commissioners thought it best to investigate the matter and to satisfy themselves by personal inspection that the monuments had remained undisturbed in their proper places. This was accordingly done at the outset of the season's work and it was ascertained that the stories of falsification of the marking were without any foundation of fact, that all of the monuments between the northeast corner of Tennessee and Bristol had been properly set and that none of them had been disturbed.

These preliminary operations occupied the time from June 23 to July 4, on which *your* day your commissioners returned to Bristol. After placing some additional monuments on the old line in and near Bristol, they proceeded to Gate City, Virginia, where the camp outfit had been stored at the close of work in the preceding autumn, and at once went into camp at Robinett, Tennessee, west of the North fork of Clinch River.

The survey of the boundary line was resumed at the point where it had been suspended the year before, at the crossing of Clinch River near Church's Ford.

From this point to Cumberland Gap the line crosses a succession of mountains and valleys, with comparatively little level or cleared land. Little difficulty was experienced in tracing the line in this part of its course, the marked trees being generally found at frequent intervals. The line preserved its

general course as before, except that two deflections to the northward were found which were similar to that found the year before near Bloomingdale.

The first of these occurred on the mountain called Wallen's Ridge, where the line made a deflection of 19° to the north before reaching the summit, and kept that course for a distance of 4643.7 feet before resuming its usual direction. There were numerous trees with both the 1802 and 1859 marks on this deflected line.

The final deflection of 4° 10′ to the north for a distance of 6503.3 feet began at the "old furnace road" near Station Creek, less than three miles from the west end of the line on Cumberland Mountain. From the western end of this offset the line runs straight to the terminus.

There has been considerable controversy and litigation over these last three miles of the boundary and a number of witnesses have testified in the case of Virginia Ag't Tennessee, Supreme Court, U. S., Oct. term, 1891, that there were none of the marks of the previous surveys remaining between Station Creek and the summit of Cumberland Mountain, owing to the destruction of the timber in that area during the military operations of the Civil War.

Your commissioners were able to find, however, three trees well marked with the mark of the 1859 survey; and at least one of these bore evidence in the position of this mark that an old diamond mark was formerly visible above it.

These marked trees were found on the east and west part of the line west of the offset and are in excellent alignment, and settled beyond the possibility of doubt the location of this part of the boundary, and hence the short remaining distance to the summit of Cumberland Mountain. This line passes near and a little south of the old mill several times referred to in the case above cited, and thence across the Union Railroad station, leaving most of the town of Cumberland Gap in Tennessee. The summit of Cumberland Mountain was reached on Saturday, August 23d, 1902, and on the following Monday the fieldwork of the survey was completed and the camp outfit was packed and shipped to Washington. Your commissioners then

separated, Professor Buchanan returned to his home at Lebanon, Tennessee, to work up his field-notes; and Mr. Hodgkins to Washington to attend to business of the commission and to draft a report of its operation; while Mr. Baylor remained on the ground until September 13, superintending the placing of monuments along the part of the line surveyed in 1902.

In conclusion, your commissioners state that they have found the duties imposed upon them by your instructions often arduous and exacting and that the survey just completed proved far more laborious and was attended by greater hardships than any of them had anticipated, but that they have nevertheless given the same careful attention to every part of it and that they believe it to be correct throughout.

*List of Monuments of Cut Limestone and Other Durable Marks, as Hereinafter More Fully Described.*

(1)—At northeast corner of Tennessee, at Burnt Hill.

(2)—On summit of Flat Spring Ridge.

(3)—On Valley Creek road, on John Toliver place.

(4)—On road from Laurel River to White Top Mountain near an old mill.

(5)—On road up Laurel River, near a double ford.

On summit of Iron Mountain, near the north end of the rocky bluff, a cairn of rocks was erected.

(6)—At eastern foot Holston Mountain, a short distance from Beaver Dam Creek, and the Virginia and Carolina Railway.

Coast and Geodetic Survey triangulation station "Damascus" on summit of Holston Mountain, a stone marked $+\begin{smallmatrix} \text{U S} \\ \text{C S} \end{smallmatrix}$

(7)—On Rockhouse Branch road in the valley, on Mary Nealy place.

(8)—On road from Barron Railway station to New Shady road, cut-stone monument of 1858–'59.

(9)—In woods, north of New Shady road where the line changes its course to south 23° 50′ west (mag.) a marked deflection from the general course of the line.

(10)—On the New Shady road, where this deflected line crosses it.

(11)—In woods, on Little Mountain, west of Cox Creek, where this bearing of 23 50' west (mag.) ends, and the line resumes its general course to the westward.

(12)—On road just north of cross-road leading to Thomas Denton place.

(13)—On road on hill on C. D. Short place.

(14)—On road on east bank of the South fork Holston River, cut-stone monument of 1858–'59.

(15)—On hill in George Garrett's cow lot, west and north of South fork Holston River.

(16)—On road to King's mill, near John Buckly house.

(17)—On road to King's mill, via Thomas place.

(18)—On summit of open hill east of Painter place, concrete monument.

(19)—On road running east of Painter house.

(20)—On road running west of Painter house, cut-stone monument of 1858–'59.

(21)—On road through woods west of Painter property.

(22)—On summit of first high ridge east of Paperville road.

(23)—On Paperville road, at Jones place.

(24)—On road west of Carmack house.

(25)—On Booher place near first marked tree, (of 1858–'59) east of Bristol.

(26)—On north property line of the main street of Bristol outside the western wall of the cemetery. Commissioner Baylor does not consider this a part of the true line.

(27)—Outside the street wall of the Bristol cemetery, at the point where the average center line of main street intersects said wall. Commissioners Hodgkins and Buchanan do not consider this a point on the boundary.

A stone post in the edge of a field, formerly owned by Z. L. Burson, at the northwest corner of the old corporate territory of the old town of Bristol. Commissioner Baylor does not consider this a point on the boundary.

(28)—In the fork of the main road, west of the town of Bristol.

(29)—On road to Bristol, east of Worley place.

(30)—On road to Bristol, west of Worley place.

Coast and Geodetic Survey triangulation station "Dunn"

on summit of ridge, on old Dunn place stone marked $+\genfrac{}{}{0pt}{}{\text{U S}}{\text{O S}}$

(31)—On Dishner Valley road.

(32)—On road to Bristol, east of Gum Spring.

(33)—On road to Bristol, near Tallman house.

(34)—On road in valley, west of old abandoned railway bed,

(35)—On Scott road.

(36)—On road west of Akard place.

(37)—On road near Jackson place.

(38)—On Boozey Creek road.

(39)—On road to Hilton ford, cut-stone monument 1858–'59.

(40)—On Timbertree road.

(41)—Between two roads just east of Gate City road.

(42)—In woods, west of Gate City road, where there is a deflection of 8° 30' to the right, or north, from the general course of the line, on old Hickman place.

(43)—In woods northeast of Bloomingdale, where this 8° 30' deflection from the general course of the line ends, in going westward, and line resumes its general course.

(44)—On road to Bloomingdale.

(45)—On Wall Gap road.

(46)—On road up ravine.

(47)—On Carter Valley road.

(48)—On Gate City and Kingsport road, cut-stone monument of 1858–'59.

Coast and Geodetic Survey triangulation station "Cloud"

on bluff of North Holston River, stone marked $+\genfrac{}{}{0pt}{}{\text{U S}}{\text{O S}}$

(49)—On east bank of North Holston River.

(50)—On road on west bank of North Holston River.

(51)—At cross-roads on Stanley Valley road, cut-stone monument of 1858–'59.

(52)—On Stanley Valley road, on hill at turn in road.

VOL. CXC—6

(53)—On Cameron Post-office road.

(54)—On Stanley Valley road south of barn of N. J. Bussell, cut-stone monument of 1858–'59.

(55)—On Stanley Valley road, cut-stone monument of 1858–'59.

(56)—On road which runs across Opossum Ridge.

(57)—On Moore's Gap road.

(58)—On Caney Valley road.

(59)—On Little Poor Valley road, south of Mary Field house.

(60)—On Poor Valley road, cut-stone monument of 1858–'59.

On summit of Clinch Mountain cairn of rocks erected, a few feet south of the Coast and Geodetic Survey triangulation station

U S

" Wildcat," which station marked with $+$ cut in sandstone rock.

C S

(61)—On Clinch Valley road.

(62)—On road on east bank of Clinch River, above Church's ford.

(63)—On road at Jane Bagley's house.

On summit of open hill east of Fisher Valley road line crosses solid rock. Small hole drilled in it, with T cut south of hole, and V north of it.

(64)—On Fisher Valley road.

On summit of high ridge, east of Robinett line crosses solid rock. Small hole drilled in it, with V cut on north side of hole, and T on south of it.

(65)—On road at Robinett.

On side of ridge at east edge of woods line crosses rock. Small hole drilled in it, with V cut on north side of hole and T on south of it.

On summit of Newman's Ridge line crosses rock similarly marked.

(66)—On Rogersville and Jonesville road.

(67)—On Little Creek Road.

(68)—On Sneedville and Black Water Salt Works road.

(69)—On Black Water Valley road, near J. Mullen's house.

Coast and Geodetic Survey triangulation station " Powell," on

summit of Powell Mountain, large sandstone rock marked $\underset{\text{c s}}{\overset{\text{u s}}{+}}$

(70)—On Mulberry Gap and Wallen Creek road, near large poplar.

(71)—Near junction of Mulberry Gap and Jonesville roads.

(72)—On east face of Wallen Ridge, on edge of trail over ridge, where there is a deflection to the right, or north, of 19° from the general course of the line.

On summit of Wallen Ridge line crosses large sandstone rock. Small hole cut in it with V. cut north of hole and T. south of it.

(73)—On west face of Wallen Ridge, in open field, on the boundary fence of Mollie Thompson and J. W. Moore, where this deflection of 19° from the general course of the line ends, in going westward, and line resumes its general course.

(74)—On road east of Powell River, and north of Welch or Baldwin ford.

On rock bluff west of Powell River, a small hole was cut with V north of this hole and T. south of it.

(75)—On Powell River and Sneedville road, on hill west of Powell River, rough stone monument with V. cut on north face and T on south face.

(76)—On Powell River and Sneedville road.

(77)—On Martin Creek road.

(78)—On Low Hollow road.

(79)—On Four Mile Creek road.

(80)—On Bayles' Mill road.

(81)—On Ball's Mill road.

Coast and Geodetic Survey triangulation station "Minter," on summit of hill, near gate and fence corner.

(83)—On road south of Jacob Estep's house.

(84)—On East Machine Branch road.

(85)—On West Machine Branch road.

(86)—On Dicktown road.

(87)—On Mud Hollow Hole road, near large limestone spring.

(88)—On Hoskins' Valley road, near large limestone spring.

(89)—On George Souther's saw mill road.

(90)—On Louisville and Nashville Railway, near Brook's crossing.

(91)—On old iron-works road, where there. is a deflection of 4° 10' to the right, or north, from the general course of the line.

(92)—On Station Creek road.

(93)—On east side of Poor Valley Ridge, where this deflection of 4° 10' from the general course of the line ends, in going westward, and line resumes its general course.

(94)—On Cumberland Gap and Virginia road, east of Cumberland Gap.

(95)—On small hill just east of road connecting Cumberland Gap with Old Virginia and Cumberland Gap road, in the edge of the old town park.

(96)—On the side of open hill facing south, about 2½ squares east of the Tazewell and Kentucky road, at Cumberland Gap.

(97)—On west side of Tazewell and Kentucky road, and just east of woolen factory at Cumberland Gap.

(98)—At foot of Cumberland Mountain, west of the Union Railway station, and in line with the south edge of the south chimney of said Union Railway station.

(99)—On summit of Cumberland Mountain. The monument of cut limestone has " V " and " T " cut on its adjacent vertical faces, and " Corner " cut on its top. Its base is set in cement and broken rock with one diagonal running east and west. The summit of the sandstone ledge was blasted in order to set this monument.

In addition to the cut-stone monuments and other durable marks, your commissioners marked with six chops, thus : —

\     /

—

—

\     /

the trees on and within ten feet of this line on each side.

Your commissioners unanimously agree in recommending that the rights of individuals having claims or titles to lands on either side of said boundary line, as ascertained, re-marked, and reëstablished by your commissioners, shall not in consequence thereof in anywise be prejudiced or affected, where said individuals have paid their taxes, in good faith, in the wrong State.

WILLIAM C. HODGKINS,   [SEAL.]
*Commissioner.*
JAMES B. BAYLOR,           [SEAL.]
*Commissioner.*
ANDREW H. BUCHANAN,   [SEAL.]
*Commissioner.*

OCTOBER 13, 1902.

*Report of the Treasurer of the Tennessee and Virginia Boundary Commission.*

To the Honorable the Chief Justice and the Associate Justices of the Supreme Court of the United States:

The treasurer of the commission appointed by the decree of this honorable court, dated April 30, 1900, to reëstablish the boundary between the State of Virginia and Tennessee, herewith submits the abstracts of the monthly expenditures of the entire work—ten in number—beginning May, 1901, and ending September, 1902, as follows:

| | | |
|---|---|---:|
| No. | 1. May 1901 | $ 384.05 |
| No. | 2. June 1901. | 1083.75 |
| No. | 3. July 1901 | 1070.18 |
| No. | 4. August 1901 | 1197.76 |
| No. | 5. September 1901 | 1263.11 |
| No. | 6. October 1901 | 1565.63 |
| No. | 7. June 1902 | 262.13 |
| No. | 8. July 1902 | 1045.45 |
| No. | 9. August 1902 | 1245.34 |
| No. | 10. September 1902 | 358.59 |
| | | $9475.99 |
| Amount chargeable to each State | | 4738.00 |

*General Summary.*

Remuneration of commissioners at $10 per day. $5730.00
Transportation to and from field . . . 274.04
Transportation in field (about) . . . 1085.58
Stone monuments . . . . . . 678.90
Labor, freight, etc. . . . . . . 1707.47

Total . . . . . . . $9475.99

Cash received from Virginia . . . . $4737.99
Cash received from Tennessee . . . . 4738.00

Total . . . . . . . $9475.99

The above is respectfully submitted.

A. H. BUCHANAN,
*Treasurer of the Boundary Commission.*

J. C. W. United States Department of Agriculture, Bureau of Forestry, Washington, D..C.

Office of the Forester.

AUGUST 20, 1901.

This beech block came from the "offset" near its western end and just east of the "Shady road."

J. B. BAYLOR,
*Commissioner.*

Mr. J. B. Baylor, Tenn.-Va. boundary commission, Abingdon, Virginia.

DEAR SIR: Your letter of August 17, and also the beech block are at hand. In the absence of Mr. Sudworth, with whom your previous correspondence has been, I am glad to give you my opinion as to the questions stated in your letter.

Owing to the very slow growth of the tree, from which this block was cut, in early life, it is not possible to count the annual rings, even with the aid of a strong magnifier, with absolute certainty of accuracy. The results I have obtained show that its age in 1802 was 96 years, and that its diameter, not includ-

ing bark, was about six inches, or about 6¼ inches including the bark. There are five wounds shown in this block. Two of these occurred in my judgment, 43 years ago, or in the year 1858. The three older wounds I believe were made 99 years ago, or in 1802.

This beech block will be carefully stored away in this bureau.

Very truly, (Signed) OVERTON W. PRICE,
*Acting Forester.*

J. C. W. United States Department of Agriculture, Bureau of Forestry, Washington, D. C.
Division of forest investigation.

NOVEMBER 11, 1901.

This hemlock block came from near the eastern end of the "off-set line"—a short distance from where the marked trees end.

J. B. BAYLOR,
*Commissioner.*

Mr. J. B. Baylor, Tenn.-Va. boundary commission, Blooming-dale, Sullivan County, Tenn.

DEAR SIR: The hemlock blocks sent to this office some time ago have remained unexamined so long on account of my absence from the office. I regret to have thus delayed the answer so long.

I have just examined the specimens, and find that the deeper scar in the larger of the two specimens was made in the year 1802. Ninety-nine annual rings were formed since the scar was made. This year's growth is still in a formative stage.

The somewhat superficial scar in the smaller specimen was made in 1858, 42 annual rings having been laid on since the mark was made. The last season's growth is not complete.

As requested in your letter of Sept. 8, these blocks will be retained subject to further advices from you.

Very truly yours,

(Signed) GEORGE B. SUDWORTH, *Chief.*

*Property List Purchased for Field Outfit in the Boundary Survey.*

| | |
|---|---:|
| 3 saddles, bridles and blankets | $27.50 |
| 1 cooking stove and repairs | 7.00 |
| 1 heating stove | 2.25 |
| 8 joints of stovepipe | 1.35 |
| 1 crowbar | .65 |
| 1 shovel | .85 |
| 1 grindstone | .90 |
| 6 axes | 3.90 |
| 2 files | .20 |
| 4 lamps | 1.00 |
| 1 saw (large) | 1.35 |
| 1 trowel | .50 |
| 2 pairs of tree-climbers | 3.50 |
| 1 cot | 2.50 |
| 1 office table | 2.50 |
| 1 dining table | 1.00 |
| Total | $56.95 |

Of the above at the close of the field-work the following were sold:

| | |
|---|---:|
| 2 saddles | $3.00 |
| 2 stoves | 2.50 |
| 2 tables | 2.00 |
| 3 lamps | .50 |
| 1 grindstone | .50 |
| 1 saw | .75 |
| 2 axes | .65 |
| 1 cot | .50 |
| 1 shovel | .60 |
| Total | $11.00 |

For the remainder, not worn out, purchasers could not be found without the delay of a commissioner in the field at a greater expense than they were worth. The proceeds of the sales made—$11.00—have been returned, one half to each State.

A. H. BUCHANAN, *Treasurer.*

*Decree entered accordingly.*