# COMMONWEALTH OF VIRGINIA *v.* STATE OF WEST VIRGINIA ET AL.

### PETITION FOR WRIT OF MANDAMUS.

No. 2, Original.   Submitted March 6, 1917.—Decided April 22, 1918.

A suggestion now made for the first time by West Virginia, viz., that that State has an interest in an alleged right of Virginia against the United States respecting lands of the Northwest Territory, presents no ground for not enforcing the judgment heretofore rendered.

The judgment heretofore rendered can not now be attacked upon the ground that in original cases in this court one State cannot recover from another in a mere action of debt.

The suit, however, was more than a mere action to collect a debt.

The principle which forbids the production of state governmental inequality by affixing conditions to a State's admission is irrelevant to the question of power to enforce the contract in this case.

The original jurisdiction conferred upon this court by the Constitution over controversies between States includes the power to enforce its judgment by appropriate remedial processes, operating where necessary upon the governmental powers and agencies of a State.

The authority to enforce its judgments is of the essence of judicial power. That this elementary principle applies to the original jurisdiction in controversies between States has been universally recognized as beyond dispute, as is manifested by the numerous cases of the kind which have been decided, in not one of which hitherto, since the foundation of the Government, has a State done otherwise than voluntarily respect and accede to the judgment.

The provision granting this jurisdiction examined as to its origin and purpose, together with the closely related provisions prohibiting interstate agreements without the consent of Congress and depriving the States of army and war-making powers and vesting them in Congress, the result being to show the clear intention of the Constitution, conceived out of regard for the rights of all the States and for the preservation of the Constitution itself, to forestall for the future the dangers of state controversies by uniting with the power to decide them the power to enforce the decisions against the state governments.

To this power the reserved powers of the States necessarily are subordinate.

The powers to decide and enforce, comprehensively considered, are sustained by every authority of the Federal Government, judicial, legislative and executive, which may be appropriately exercised.

The vesting in Congress of complete power to control agreements between States clearly rested upon the conception that Congress, as the repository not only of legislative power but of primary authority to maintain armies and declare war, speaking for all the States and for their protection, was concerned with such agreements and therefore was virtually endowed with the ultimate power of final agreement which was withdrawn from the States.

It follows, by necessary implication, that the power of Congress to grant or withhold assent to such contracts carries with it the duty and power to see to their enforcement when made operative by its sanction.

This power is plenary, limited only by the general rule that acts done for the exertion of a power must be relevant and appropriate to the power exerted.

As a national power it is dominant and not circumscribed by the powers reserved to the States.

The power of Congress to legislate for the enforcement of a contract between two States under the circumstances here presented is not incompatible with the grant of original jurisdiction to this court to entertain a suit on the same subject.

The power of Congress also extends to the creation of new judicial remedies to meet the exigency occasioned by the judicial duty of enforcing a judgment against a State under the circumstances here presented.

Out of consideration for the character of the parties, and in the belief that the respondent State will now discharge its plain duty without compulsion, and because the case is such that full opportunity should be afforded to Congress to exercise its undoubted power to legislate, the court abstains from determining what judicial remedies are available under existing legislation and postpones the case, for future argument upon the following questions: (1) Whether mandamus compelling the legislature of West Virginia to levy a tax to pay the judgment is an appropriate remedy. (2) Whether the power and duty exist to direct the levy of a tax adequate to pay the judgment and provide for its enforcement irrespective of state agencies. (3) Whether, if necessary, the judgment may be executed through some

other equitable remedy, dealing with such funds or taxable property of West Virginia, or rights of that State, as may be available.

Right is reserved in the meantime to appoint a master to examine and report concerning the amount and method to taxation, whether by the state legislature or through direct action, essential to satisfy the judgment, as well as concerning the means otherwise existing in West Virginia which, by the exercise of equitable power, may be made available to that end.

ON January 29, 1917, Virginia submitted her motion for leave to file a petition for a writ of mandamus, and for an order directed to the State of West Virginia and the members of her legislature requiring them to show cause why the writ should not issue, commanding the levy of a tax to satisfy the judgment heretofore recovered by Virginia. The motion was granted February 5, 1917, and the rule issued returnable March 6th following. The present decision arose upon the respondents' motion to discharge the rule, submitted on the latter date.[1]

---

[1] The Reporter has decided to reproduce the petition and motion, believing that they will add to the future, if not to the immediate, value of the report. He regrets that, in doing this, the attached exhibits and the names of numerous respondents have been perforce omitted, for lack of space. The captions have been left off also. The petition is as follows:

*TO THE CHIEF JUSTICE AND THE ASSOCIATE JUSTICES OF THE SUPREME COURT OF THE UNITED STATES:*

The Petition of the Commonwealth of Virginia by John Garland Pollard, her Attorney General, shows to the Court that:

### I.

The Commonwealth of Virginia filed a Bill in this Court on leave on February 26, 1906, against the State of West Virginia, praying that the State of West Virginia's proportion of the public debt of Virginia, as it stood prior to 1861, be ascertained and satisfied.

### II.

On June 14, 1915, this Court entered its decree and judgment in the suit as follows:

Mr. *John Garland Pollard*, Attorney General of the State of Virginia, Mr. *Wm. A. Anderson*, Mr. *Randolph Harrison*, Mr. *John G. Johnson* and Mr. *Sanford Robinson*, for petitioner:

In view of the answer of West Virginia, which stated that it had no property subject to execution, and of its claim

---

"SUPREME COURT OF THE UNITED STATES

Original No. 2.            October Term, 1914.

COMMONWEALTH OF VIRGINIA, *Complainant*,

vs.

STATE OF WEST VIRGINIA, *Defendant.*

"This cause came to be heard on pleadings and proofs, the reports of the Special Master and the exceptions of the parties thereto, and was argued by counsel.

"On consideration whereof, the Court finds that the defendant's share of the debt of the complainant is as follows:

"Principal, after allowing credits as stated, $4,215,622.28; interest from January 1, 1861, to July 1, 1891, at four per cent per annum, $5,143,059.18; interest from July 1, 1891, to July 1, 1915, at three per cent per annum, $3,035,248.04, making a total of interest of $8,187,307.22, which, added to the principal sum, makes a total of $12,393,929.50.

"It is therefore now here ordered, adjudged and decreed by this Court that the complainant, Commonwealth of Virginia, recover of and from the defendant, State of West Virginia, the sum of $12,393,929.50, with interest thereon from July 1, 1915, until paid, at the rate of five per cent per annum.

"It is further ordered, adjudged and decreed that each party pay one-half of the costs.

"June 14, 1915."

### III.

The said judgment and decree has ever since remained and is now unpaid. The State of West Virginia has failed to pay the Commonwealth of Virginia the same, or any part thereof, although payment has been respectfully requested by the Commonwealth of Virginia of the State of West Virginia.

that this court cannot bring about a payment of its decree by the issuance of writ of mandamus or of any other process, the present record presents this question: "If, as the result of a controversy between two States, a decree is entered by this court against one, in favor of the other,

---

## IV.

The correspondence showing the request of the Commonwealth of Virginia to the State of West Virginia for the payment of said decree and judgment, and the correspondence relating to a proposed joint conference of the Debt Commissions of the two States, as suggested by the West Virginia Commission, are hereto attached and made a part of this petition.

From said correspondence it will appear:

That on October 19, 1915, the Chairman of the Virginia Debt Commission, in pursuance of authority from that body, addressed a letter to the Governor of West Virginia, requesting that provision be made for the payment of said decree and judgment.

That on October 28, 1915, the Governor of West Virginia replied that he had convened the West Virginia Debt Commission, and in conjunction with them had reached the conclusion that it would be to the advantage of both States to have a joint conference of the Commissions of the two States at the earliest date possible.

That on November 12, 1915, the Chairman of the Virginia Debt Commission, in pursuance of authority from that body, replied, suggesting that the proposed joint conference be held on November 23, 1915.

That on November 12, 1915, the Governor of West Virginia replied by telegram that he would communicate with the members of the West Virginia Commission and would later reply further, which later reply was duly received November 19th, and was to the effect that the West Virginia Commission would probably not be able to have the joint conference, or meeting, before some time early in December, of which he would advise the Virginia Commission later.

That on December 6, 1915, no further advice having been received from the Governor of West Virginia, the Chairman of the Virginia Debt Commission addressed another letter to the Governor of West Virginia, expressing the hope that the Virginia Commission might receive a reply at an early date.

To this letter, addressed on December 6, 1915, to the Governor of West Virginia, no reply has been received.

is the court unable, despite the pecuniary ability of the debtor, to compel payment?"

Past records disclose cases in which municipal bodies have repudiated their sealed obligations; but the State of West Virginia presents, perhaps, the first instance in

### V.

On June 5, 1916, the Commonwealth of Virginia moved the Court to issue its writ of execution directed to the Marshal of this. Court against the State of West Virginia, directing the Marshal of this Court to levy upon the property of the State of West Virginia, subject to such levy, for the satisfaction of the decree and judgment in the suit of the Commonwealth of Virginia against the State of West Virginia herein above mentioned, and that the Commonwealth of Virginia be granted such other and further relief in the premises as was just and meet. This Court denied the motion for the reason stated in the opinion of the Court. [241 U. S. 202.]

### VI.

The answer and return of the State of West Virginia to the petition and motion of the Commonwealth of Virginia for a writ of execution asserted that the writ of execution prayed for by the Commonwealth of Virginia should not be issued for the following, among other, reasons, and upon the following, among other, grounds:

"Because not only presumptively, but in fact, the State of West Virginia did not, before or at the time of the rendition of the judgment herein, own, and has not since owned, and does not now own, any property, real or personal, except such property as was, and is devoted exclusively to public use, and none of the property so devoted may be levied upon or sold under execution."

### VII.

On November 14, 1916, the Virginia Debt Commission learning that the Governor of West Virginia was about to convene the Legislature of West Virginia in extra session, through its Chairman telegraphed the Governor of West Virginia requesting him to include in the call, to be issued for that purpose, as one of the matters to be considered, the settlement of the decree of this Court rendered in favor of Virginia in the suit of the State of Virginia against West Virginia, to which the Governor of West Virginia replied by telegraph, on November 15, 1916, giving as his reasons for not embodying the matter of the debt settlement in his call, that the time the Legislature would be in session was too short for a proper consideration of the matter, and, in addition,

which one of the great Commonwealths of the Union has repudiated the duty imposed upon it to satisfy a debt decreed to be paid by it.

that on the second Wednesday of January, 1917, the Legislature would convene in regular session composed, with the exception of hold-over Senators, of newly-elected members to whom, as the Governor thought, the question should be submitted, copies of which telegrams are hereto annexed and made a part of this petition. Thereafter, on or about November, 1916, the Governor of West Virginia issued a call convening the Legislature of West Virginia in extra session, and did not include in said call as one of the matters to be considered, the settlement of the decree of this Court in favor of Virginia in the suit of Virginia against West Virginia. Thereafter, in November, 1916, the Legislature of the State of West Virginia met in extra session and remained in session until December 1, 1916, without giving any consideration in any respect to the settlement of said decree of this Court.

## VIII.

On December 29, 1916, the Chairman of the Virginia Debt Commission, in pursuance of authority from that body, addressed a letter to the Governor of West Virginia requesting him by a special message to urge upon the Legislature, soon to assemble, the prompt enactment of such legislation as may be requisite to provide the proper means for the liquidation of the decree entered against the State of West Virginia in favor of the Commonwealth of Virginia, and on said December 29, 1916, the Chairman of the Virginia Debt Commission, in pursuance of authority from that body, also addressed a letter to the President of the Senate and the Speaker of the House of Delegates of the State of West Virginia, requesting that the Legislature of the State of West Virginia at its coming session take such steps, and make such enactments as may be necessary to insure the prompt payment of the aforesaid indebtedness, to which letters the Governor of the State of West Virginia replied by a communication dated January 9, 1917, and the President of the Senate replied by communication dated January 11, 1917, respectively, copies of which letters are hereto annexed and made a part of this petition. No reply has as yet been received from the Speaker of the House of Delegates.

## IX.

The West Virginia Legislature convened on January 10, 1917, and since that date has been in session at the Capitol in Charleston, West Virginia.

We will not dignify the suggestion of a defense because of an alleged conditional deed delivered in 1783, with notice, for the obvious reason that not only is the claim upon its own face unworthy of notice, but because one State cannot liquidate an indebtedness owing by it to

The Legislature of the State of West Virginia consists of the Senate and the House of Delegates.

The members of the Senate of the State of West Virginia are Honorables [here follow their names].

The members of the House of Delegates of the State of West Virginia are [here follow their names].

The Honorable Wells Goodykoontz is the President of the Senate, and Honorable Joseph S. Thurmond is the Speaker of the House of Delegates of the State of West Virginia.

X.

It was the absolute ministerial duty of the Legislature of the State of West Virginia, and of the aforesaid Senators and Members of the House of Delegates thereof, to take the necessary steps and make the necessary enactments to provide for the payment of the said judgment of $12,393,929.50, with interest and costs as provided in said judgment, upon the convening of said Legislature on January 10, 1917, but, although respectfully requested to do so by your petitioner, the Legislature and the members thereof have taken no step and have made no enactment to provide for, or insure payment of the aforesaid indebtedness. Nor have any steps been taken by the Legislature, or the Senate, or the House of Delegates to give any indication, or hope that the Legislature will, or intends to make provision for the payment of said indebtedness. On the contrary the Governor of West Virginia, in a special message on the "Virginia Debt," submitted to the Legislature of that State on January 18, 1917, a copy of which is attached hereto, recommended that the Legislature

"present to the Court a petition for a re-hearing of the matter of the interest upon the debt;"
and further recommended that

"Provision should be made also by the Legislature for having presented to the Supreme Court of the United States the contentions of West Virginia as to why Virginia should be restrained from pressing her claim against West Virginia further, until the State of Virginia sues in the Court of Claims, as I am informed

another State, by setting up a claim that there is an indebtedness owing to it by the United States. Presumably, a claim against a party, thought unworthy of notice, between 1783 and 1910, would not go far in 1917 towards liquidating an indebtedness owing by a second party to a third. The claim of inability on the part of this court to en-

she can, for the purpose of recovering her claim growing out of the cession of the Northwest Territory, and thereby reducing the joint assets of the two States to a common fund, which will place the States in a position to receive their proportionate credits and to end further litigation."

And concluded with the expression of the hope

"that some suggestion will be forthcoming that will result in the protection of the interests of our State in this litigation, and bringing about the consideration of further equities which West Virginia is entitled to receive, and after the proper equities have been conceded to the State, the prompt liquidation of the residue, if any there be."

### XI.

Under the Constitution of the State of West Virginia the session of the Legislature now convened will be adjourned on or before the 24th day of February, 1917, unless, by the concurrence of two-thirds of the members elected to each house, its session shall be further continued beyond said date; and the Legislature must assemble biennially and can not assemble oftener unless convened by the Governor.

In consequence of the time which has already elapsed without any effort being made by said Legislature to perform its duty in the matter of making provision for the payment of the said decree and judgment, there will be insufficient time therefor unless the Legislature promptly, and without further delay performs its said duty.

Your petitioner avers that it is not the intention of the authorities of West Virginia to take any steps by legislation, or otherwise, to make provision for the payment of the said judgment and decree, but that it is the intention to delay making provision for such payment under the pretexts set forth in the letter from the Governor of West Virginia dated January 9, 1917, and in the special message submitted to the Legislature of that State on January 18, 1917, copies of which are hereto attached, until it will be too late for the Legislature of West Virginia now assembled to take any action in the premises.

It is further averred that your petitioner is without remedy in the

force its decree is one of far-reaching importance. If it be sustained, its decrees will be little better than waste paper.

Our contention is, that though a decree may fail of liquidation because of the debtor's lack of funds, it can

premises unless this Court shall command the Senators and Members of the House of Delegates of the State of West Virginia to assess and levy a tax upon the property in the State of West Virginia to provide for the payment of said judgment and decree according to the terms thereof, as they are in duty bound to do.

WHEREFORE, your petitioner, Commonwealth of Virginia, prays that a rule be made and issued from this Court, directed to the said Honorable Wells Goodykoontz, President of the Senate, Honorables . . . . Senators of the State of West Virginia; Honorable Joseph S. Thurmond, Speaker of the House of Delegates, Honorables . . . . Members of the House of Delegates of the State of West Virginia, to show cause why a writ of mandamus should not issue commanding the said Honorable Wells Goodykoontz, President of the Senate, Honorables . . . . Senators of the State of West Virginia; Honorable Joseph S. Thurmond, Speaker of the House of Delegates, Honorables . . . . Members of the House of Delegates of the State of West Virginia, forthwith and at the present session of the Legislature to assess and levy a tax upon the property within the State of West Virginia sufficient to provide for the payment of said Judgment of $12,393,929.50, with interest thereon from July 1, 1915, until paid, at the rate of five per cent per annum, and costs, according to the terms of said judgment, unless the Legislature shall forthwith and at its present session make provision for the payment of said judgment by a duly authorized issue of bonds, the proceeds of which shall be sufficient to pay said judgment in full in cash, and for such other and further relief in the premises as shall seem just and meet; and your petitioner will ever pray, etc.

                COMMONWEALTH OF VIRGINIA,
                    By JOHN GARLAND POLLARD,
                        *Attorney General of Virginia.*

The motion and return are as follows:

And now come the respondents, the State of West Virginia and Wells Goodykoontz, President of the West Virginia Senate, et al., being all the members of said Senate, and Joseph S. Thurmond, Speaker of the

never thus fail where the debtor is abundantly able to
pay and where a body in the State has power to appro-
priate the State's funds to that purpose.

Upon each of the three great departments of the Na-
tional Government are imposed duties, and each, either
expressly or impliedly, is vested with powers to perform
them. The makers of the Constitution, where they im-

---

House of Delegates of the State of West Virginia, et al., being all the
members of said House of Delegates, and move to quash the rule
awarded against them at the prayer of the Commonwealth of Virginia
upon the 5th day of February, 1917, ordering them to show cause
before this Court on the 6th day of March, 1917, why a writ of manda-
mus should not issue against them as prayed, and assign as grounds of
said motion the following:

1. A writ of mandamus from the Supreme Court of the Nation
coercing the legislative department of a State, and compelling it to
enact a revenue law, or to lay a tax for State purposes, would infringe
upon the constitutional rights of the States expressly reserved unto
them by the Tenth Amendment to the Federal Constitution.

2. The constitutional grant of jurisdiction to hear and determine
controversies between States does not include, as an incident to such
jurisdiction, the power to enforce a judgment, rendered in the ex-
ercise thereof, by a writ of mandamus addressed to a State Legis-
lature, coercing and controlling it in the exercise of its legislative
functions.

3. Such a writ for such a purpose would be contrary to the principles
and usages of law, and does not fall within the category of final writs
against a State.

4. It is not the office of a writ of execution, nor can it be of any writ
used as a substitute therefor, to create property, by legislation or other-
wise, for the satisfaction of a debt, but only to seize and subject prop-
erty already in existence for that purpose.

And now, by leave of Court, these respondents, without waiving
their motion to discharge said rule, or any of the grounds assigned in
support thereof, make further return thereunto as follows:

I. They deny, as charged in the tenth paragraph of the petition of
the relator, that it was the absolute ministerial duty of the Legislature
of the State of West Virginia, and of the members of her Senate and
House of Delegates, upon the convening of said Legislature on Jan-
uary 10, 1917, to take the necessary steps and make the necessary

posed a duty, granted the power to perform it. Owing to the commercial, and other, relations, between the States, it was extremely probable that transactions would arise which would result in indebtedness by one to another. It was therefore, in view of the abandonment of absolute

enactments providing for the payment of the judgment in favor of the State of Virginia against the State of West Virginia, and described in said petition. On the contrary, they say that their duties in the premises, and under the 8th Section of the 8th Article of the Constitution of West Virginia of 1863, were, and are, not ministerial, but legislative, deliberative and discretionary; and they further say that, instead of omitting or neglecting their duty as charged in the petition, upon the convening of the Legislature on January tenth, or shortly thereafter, the Senate and House of Delegates, each for itself, appointed a committee, with authority to hear arguments, report upon resolutions and recommend appropriate measures looking to the settlement of the judgment rendered at the suit of Virginia against West Virginia, which committees were ready to begin their sittings and to enter upon their work at the time of the presentation of the petition of the relator to this Court; but that since said time, and in consequence of said petition and the rule ordered thereon upon the 5th day of February, 1917, all matters relating to the settlement of said judgment have been suspended and held in abeyance, except that, on the 21st day of February, a joint resolution was adopted by both houses of the Legislature, directing the Attorney General of the State and associate counsel to make appearance and defense, in the name and on behalf of the State of West Virginia and the several members constituting the Senate and House of Delegates thereof, to the rule in mandamus issued herein; and said resolution further provided that, in the event the Legislature should not be in session at the time of the rendition of the Court's judgment upon said rule, whether its judgment be for or against the State of West Virginia, the Governor is requested to convene the Legislature in special session as soon as may be for the purpose of doing without delay what should be done in the premises.

A copy of said resolution is filed herewith as a part hereof.

II. Further answering, these respondents say that they are advised that the writ of mandamus is a discretionary writ, and that this Court will exercise its discretion against the issuance thereof if to issue the same would give an undue advantage to the relator, or operate unjustly against the respondents; and they say that it should not be issued in this case for the following reasons:

independence, imperatively necessary that some method should be devised by which the existence of indebtedness could be determined, and its collection enforced. There was but one department by which this result could be attained, *i. e.*, the judicial department.

By Art. III of the Constitution it was required that

These respondents are informed and believe, and upon such information and belief say, that the State of Virginia has a claim against the Government of the United States for many millions of dollars, which should be collected, and, when collected, that the State of West Virginia should participate therein in the same ratio that she, the State of West Virginia, is compelled by the judgment of this Court to contribute to the payment of Virginia's *ante bellum* debt; that is to say, she should be paid out of said claim by the State of Virginia 23½% thereof.

And they further say that they are advised that the State of Virginia alone can take steps for the collection of said claim, and are informed that Virginia has taken no such steps, but has to the present time withheld, and still withholds, from any effort to reduce this common asset to possession, and yet seeks to compel the State of West Virginia to pay her proportion of the common debt, and thus denies her the opportunity to share in the common assets.

They further say that the equity aforesaid was not passed upon by this Court in the settlement of the controversy between Virginia and West Virginia, and could not have been, because the United States was not a party thereto, and could not have been, but that the State of Virginia could have theretofore impleaded the United States in the Court of Claims upon the claim aforesaid, and reduced the same to possession, so that West Virginia could have asserted, and this Court could have allowed, her right to participation therein, but she did not, but then failed and refused, and still fails and refuses, so to do.

These respondents further say that the origin, nature and history of the claim aforesaid is as follows:

Prior to the adoption of the articles of confederation entered into by the thirteen original States, Maryland refused to sign the same, unless and until those States holding western territory should surrender the same to the United States. The State of Virginia at the time laid claim to all that territory lying northwest of the Ohio River out of which the States of Ohio, Indiana, Illinois, Michigan, Wisconsin and a portion of Minnesota have since been formed; and, by an Act of her General Assembly passed at a session commencing on the 20th day of

there should be one Supreme Court, though it was permitted to Congress, from time to time, to ordain and establish inferior courts. It was provided that the judicial power should extend to many enumerated cases and: "2. To controversies between two or more States." If the con-

---

October, 1783, and for the purpose of expediting the establishment of the proposed confederation, authorized her delegates in Congress to convey to the United States in Congress assembled all her territory northwestward of the Ohio River, and, on the first day of March, 1784, her delegates in Congress, consisting of Thomas Jefferson, Samuel Hardy, Arthur Lee and James Monroe, and pursuant to the Act of October 20, 1783, presented a deed to Congress ceding all the territory of Virginia northwestward of the Ohio River to the United States, upon certain terms, conditions and trusts therein set forth, which deed of cession was accepted according to its terms, and directed to be recorded and enrolled among the Acts of the United States in Congress assembled. Among the conditions set out in the deed and accepted by Congress was the following:

"(F) That all the lands within the territory so ceded to the United States, and not reserved for, or appropriated to, any of the before-mentioned purposes, or disposed of in bounties to the officers and soldiers of the American Army, shall be considered as a common fund for the use and benefit of such of the United States as have become, or shall become, members of the confederation or federal alliance of the said States, Virginia inclusive, according to their usual respective proportions in the general charge and expenditures, and shall be faithfully and *bona fide* disposed of for that purpose, and for no other use or purpose whatsoever."

It further appears from the requisitions made by Congress upon the thirteen States at the time of this cession that Virginia's "usual respective proportion in the general charge and expenditures" was about one-seventh of the whole; and it seems to be also conceded that the moneys derived from the sale of the lands embraced in this cession were to be applied to the extinguishment of the public debt incurred in the War of the Revolution, which debt was finally paid; so that, after this part of the trust had been met, and certain other conditions of the deed had been performed, the residue of the trust fund should have been applied to the reserved interests of the States set forth in Article (F) of the deed, Virginia included, and to "no other use or purpose whatsoever." In-

tention of West Virginia be sustained, this clause created not "judicial *power*," but "judicial impotence." The power conferred over controversies between two or more States was conferred in precisely the same way that power was conferred over controversies "between citizens of

---

stead of doing this, however, Congress seems to have donated many of these lands and much of the proceeds thereof to purely local purposes not contemplated by the deed of cession, but actually contrary to its terms.

The total acreage embraced, according to government surveys, in the cession amounted to 170,208,613 acres, and out of this Congress seems to have donated to local uses, contrary to the deed, 38,864,189 acres, which, valued at $2 per acre, the price fixed by Congress when these lands were offered for sale by the Act of May 18, 1796, would amount to $77,728,378. In addition to this, proceeds of the sales of lands amounting to $2,953,654.70 were likewise donated to local uses, making an aggregate of donations contrary to the deed of $80,682,032.70.

In addition to this, their information is that the trust has not even yet been entirely administered, but that there remains on hand undisposed of several thousand acres of these lands; and, not [now?] adding the value of these to the value of the local donations above ascertained, and allowing unto Virginia one-seventh thereof as her residuary interest in the trust, there would be due and payable from the Government of the United States to the State of Virginia the sum, at the least, of $12,000,000, in which West Virginia should share in the same ratio that she is compelled to contribute to the payment of Virginia's debt; that is to say, she should receive $23\frac{1}{2}\%$ thereof.

The foregoing epitome of said claim is based upon information and belief, and, in support thereof, a copy of the message of Governor Swanson of Virginia to the General Assembly of that State, and dated January 24, 1910, is exhibited herewith as a part of this return.

WHEREFORE, said respondents, and each of them, pray that said rule may be discharged, and the peremptory writ of mandamus denied.

STATE OF WEST VIRGINIA,

[Here follow the signatures of the individual respondents.]

By          E. T. ENGLAND,<br>Attorney General of West Virginia.

JOHN H. HOLT,

Special Counsel for State of West Virginia.

[Verification]

different States" or "between a State and citizens of another State."

We are, therefore, in the present controversy, presented with a case in which the court proceeded because judicial power so to do had been expressly vested in it by the Constitution of the United States. It was necessary for it to enter its decree in favor of the plaintiff or of the defendant. The decree which was entered was in the performance by this court of a duty imposed upon it.

Can it possibly be that nothing more was intended by the Constitution than that this court should go through the useless, and meaningless, work of merely making a suggestion to the State of West Virginia that it owed to the State of Virginia a designated amount of money, which it would be right for it to consent to pay? Would such a proceeding, thus ending in naught, have been in exercise of "judicial power"?

When jurisdiction was given to this court, in controversies between citizens of different States, and in cases of admiralty, and in controversies to which the United States should be a party, it was not deemed necessary to prescribe the process of execution or command which would compel performance of its decrees. With the grant of the power went, by necessary implication, the ability to exercise it in usual methods. It may well be that this court has no power, itself, to levy a tax. This power rests in the legislatures of the different States. There are several cases in which this court has said that of itself, and by itself, it has no such power of tax assessment. What it does possess, however, is the power to coerce the performance by the legislature of a duty necessary to be performed, in order to effectuate its decrees.

*Rees* v. *Watertown,* 19 Wall. 107, and *Meriwether* v. *Garrett,* 102 U. S. 472, relate to the judicial inability to levy taxes directly, not questioning the power to compel their levy in proper cases by those who are authorized

to do so. *Cf. Supervisors* v. *United States*, 4 Wall. 435; *Heine* v. *Levee Commissioners*, 19 Wall. 655.

In *Louisiana* v. *Jumel*, 107 U. S. 711, the bondholders' right was denied because of their inability to sue the State. The court however said: "When a State submits itself, without reservation, to the jurisdiction of a court in a particular case, that jurisdiction may be used to give full effect to what the State has by its act of submission allowed to be done; and if the law permits coercion of the public officers to enforce any judgment that may be rendered, then such coercion may be employed for that purpose."

There is no magic in the word "sovereignty," where a State had been subjected to a decree by this court to pay an indebtedness. The power of this court in all cases in which it has jurisdiction over a State, is necessarily supreme. There is no practical difference in the degree of power to be exercised in ordering municipal officers to levy a tax to pay a judgment against the municipality, and in requiring a state legislature to make such a levy in a case like this. The remedy which is asked for in this case is one which is always pursued in the case of a governmental body, municipal or otherwise, which is indebted and which fails to pay or is unable to pay under execution.

In the present case, West Virginia has no funds which can be seized. All its property is in public use. It is, however, a very prosperous Commonwealth, abundantly able, by taxation, to liquidate all its indebtedness.

Its legislature is vested with an unrestricted power to levy taxes to meet its liabilities.

This court cannot compel the exercise of discretion in a legislature; but it can compel the performance of a duty where such performance is necessary, in order that its decrees may not be treated as idle words. It is the duty of the legislature to levy taxes sufficient to meet its indebtedness. There is no pretense in any of its pleadings

that it cannot, by taxation, procure amply sufficient means.

Mandamus is a proceeding ancillary to the judgment which gives jurisdiction, and, when issued, it becomes a substitute for the ordinary process of execution to enforce the payment of the same. *Supervisors* v. *United States*, 4 Wall. 435; *Von Hoffman* v. *City of Quincy*, 4 Wall. 535; *City of Galena* v. *Amy*, 5 Wall. 705; *Riggs* v. *Johnson County*, 6 Wall. 166; *Walkley* v. *City of Muscatine*, 6 Wall. 481; *Labette County Commissioners* v. *Moulton*, 112 U. S. 217.

It is not by the office of the person to whom the writ is directed, but the nature of the thing to be done, that the propriety or improbity of a mandamus is to be determined. *Kendall* v. *United States*, 12 Pet. 524, 617; *Marbury* v. *Madison*, 1 Cranch, 137, 170.

This court has taken jurisdiction of this case and jurisdiction includes the power to enforce the execution of what is decreed. Blackstone (Cooley's ed.), p. 242; *Riggs* v. *Johnson County*, 6 Wall. 166, 187.

As we have said, the legislature of West Virginia is under an express constitutional obligation to provide for the payment of the amount ascertained by the court to be due. The obligation to do so is part of the contract upon which the judgment is founded. See § 8, Art. VIII, of the Constitution of West Virginia, which became operative and was in force when she was admitted into the Union on June 20, 1863; and also the opinion of the court, per Mr. Justice Holmes, in *Virginia* v. *West Virginia*, 220 U. S. 1, 30.

Should the legislature see fit to raise the money by creating a bonded indebtedness, it may thus save the necessity of a large immediate levy. Its primary duty, however, is to pay the debt, and the only discretion conferred upon it is to determine whether it will pay it by exercising one power or another. Its duty is to exercise a power which will force payment. The issue raised by

West Virginia as to the judicial power to use an ordinary judicial remedy to enforce a judicial decree, is most momentous. The question, however, seems to us, though we state the fact most respectfully, one not difficult of solution.

*Mr. E. T. England,* Attorney General of the State of West Virginia, and *Mr. John H. Holt,* for respondents:

A writ of mandamus from the Supreme Court of the Nation coercing the legislative department of a State to enact a revenue law, or to lay a tax for state purposes, would infringe upon the rights of the States expressly reserved by the Tenth Amendment to the Federal Constitution.

The power of laying taxes for state purposes nas not been "delegated to the United States by the Constitution, nor prohibited by it to the States," and, in consequence, this power has been "reserved to the States." It was never contemplated that the States would lay levies for national purposes, or that the Federal Government would lay them for state purposes. On the contrary, we have, under the Constitution, two distinct powers of taxation, the one for federal, and the other for state purposes; and it is exercised, in the one case, exclusively by the Federal Government, and, in the other, by the State. Neither may encroach upon the other. Otherwise, there would be an irreconcilable conflict between an indestructible Union, upon the one hand, and equally indestructible States, upon the other. It is true that one State may not destroy the Union, but it is equally true that the Union may not destroy one State. In addition to this, the power of taxation in each government is lodged in the legislative department thereof, and may not be exercised by the judicial department of either government in any case.

What, then, is the character and the purpose of the particular tax that it would be sought to levy by the writ

of mandamus prayed? Clearly it is a state tax, to be de-
voted exclusively to a state purpose; that is to say, to
the payment of a state debt, and is such a tax as may be
authorized, in consequence of the Tenth Amendment,
only by the state government. It involves one of the
expressly reserved sovereignties of the State, and this
express reservation may not be overturned by an anteced-
ent implication that the power to decide necessarily em-
braces the power to execute. The conclusion, therefore,
would seem to be irresistible that the Federal Govern-
ment cannot, through its judicial or any other department,
coerce a State in the exercise of its reserved powers by
compelling the legislature thereof to exercise such powers
contrary to its discretion, and in opposition to its will.
The existence and exercise of such a power would overturn
the Tenth Amendment, and make serious inroads upon
the fundamental rights of the States. In other words,
the provision contained in § 2 of Art. III, of the Constitu-
tion, giving the Supreme Court original jurisdiction "in
all cases . . . in which a State shall be a party,"
if it should have added to it, by inference or argument,
and as an incident to such jurisdiction, the power to en-
force a judgment rendered in any such case through the
medium of a writ of mandamus controlling the legislative
action of a State in respect to its reserved powers, would
render the subsequently adopted Tenth Amendment
abortive.

In the case of *South Dakota* v. *North Carolina*, 192 U. S.
286, Mr. Justice Brewer, in delivering the majority opinion
of the court, speaks of "the absolute inability of a court
to compel a levy of taxes by the legislature"; and the
foregoing conclusion is further strengthened by the
opinions of this court, speaking through Mr. Justice Miller,
in the cases of *Heine* v. *Levee Commissioners*, 19 Wall. 655,
and *Rees* v. *Watertown*, 19 Wall. 107.

To like effect is *Meriwether* v. *Garrett*, 102 U. S. 472, and

the reasoning of this court in *Kentucky* v. *Dennison*, 24 How. 66. See also *Carter* v. *State*, 42 La. Ann. 927.

Jurisdiction to hear and determine may, and does ordinarily, include the power to enforce (or rather the power to issue proper writs for the enforcement of a judgment); but mandamus cannot, under the Constitution, become a substitute for a writ of execution upon a judgment against a State. Execution may be issued upon a judgment regularly rendered against a State, and be levied upon any property owned by the State, and not devoted to political or governmental purposes, and, if no such property be found, the writ must be returned *nulla bona*, and the end of the law has been reached, because, as we have seen, the legislative department of a State may not be coerced, under the Constitution; and there is nothing remarkable in this situation, because frequently judgments are rendered and executions issued thereon which are returned *nulla bona*, and all legal remedies thereby exhausted. The courts can only give suitors the proper process, original and final, and, if these fail to satisfy the creditor's claim, there is no fault in the judiciary. In other words, jurisdiction does not include or imply the collection or satisfaction of a debt, but only means the power to hear and determine, and to render judgment therefor and issue proper process thereon.

Cases in which subordinate agencies of a State have been compelled by mandamus to levy taxes in accordance with their duty under the state law throw no light on the situation.

Such a writ for such a purpose would be contrary to the principles and usages of law, and does not fall within the category of final writs against a State. At common law, Parliament never was, and could not be, coerced by the writ of mandamus. *People* v. *Morton*, 156 N. Y. 136. And, in this country, the same principles and usages have always obtained. *Ex parte Echols*, 39 Alabama, 698;

*State* v. *Bolte,* 151 Missouri, 362. Certainly such is true with respect to the mandamus of state legislatures by state courts, and there is no case on record where this court has ever addressed a writ of this character to the law-making power of a State.

We are not unmindful of the dangers and difficulties of analogy; but, if this were the case of an individual judgment debtor, it is plain that, after a writ of execution had gone against him and been returned *nulla bona,* and after it had been ascertained, in addition thereto, that he had no real estate out of which to satisfy the judgment, although he might have great earning capacity, no one would contend that the exercise thereof might be compelled by the writ of mandamus. He might be able to sing or dance, and even be bound by contract to do both, and yet he would not be compelled to do either. *Lumley* v. *Wagner,* 1 De G., M. & G. 604.

It may be answered that a fund was created by mandamus for the payment of a debt in the case of *Supervisors* v. *United States,* 4 Wall. 435, and like cases. But it will be observed that in each of those cases all necessary legislative action had theretofore been had, and the proper ministerial agents appointed for the effectuation thereof; so that nothing was left to be done except to have resort either to the state or federal courts for a writ of mandamus to compel the performance of a purely ministerial act; made mandatory by the act of the only branch of government having any discretion in the premises.

Section 8 of Art. 8 of the West Virginia constitution of 1863 imposed no ministerial duties upon the legislature of the State, but only judicial and legislative duties. We come back, therefore, to the question whether or not this court can or will interfere by mandamus to coerce the action of a state legislature in the performance of purely legislative functions within its exclusive jurisdiction, and this, it is submitted, this court will not do, for the same

reason, among others, that it refused in the case of *Louisiana* v. *Jumel*, 107 U. S. 711, to oust the political power of the State of Louisiana of its jurisdiction, and set the judiciary in its place.

It should be further observed that the petition prays for a mandamus commanding the legislature to assess and levy a tax to provide for the payment of the judgment unless the legislature shall provide for the payment by bonds. This not only illustrates, but actually invokes, the discretion of the legislature, and does not at that embody all of its discretionary power when measured by the constitutional provision invoked. The legislature could perhaps under the state constitution, either (1) lay a tax upon all property, real and personal, within the State, to be collected at once, sufficient to pay the judgment, or (2) it might, under that constitution distribute the tax over a period of years, or (3) it might resort to a bond issue, which would be governed either by § 8 of Art. 8 of the constitution of 1863, or by § 4 of Art. 10 of the present constitution.

If under the former, a sinking fund would have to be provided "sufficient to pay the accruing interest and redeem the principal within thirty-four years"; that is to say, the period of payment might be short or long, either one year or thirty-four, within the discretion of the legislature. And if under the latter, payment would have to be "equally distributed over a period of at least twenty years"; that is to say, the annual contributions to the sinking fund would have to be equal for a period of twenty years or more, again at the discretion of the legislature. In any event, the wide discretion of the legislature is illustrated; and it should be further borne in mind that that body is composed of two houses, one of which might deem its discretionary duty to lie in one direction, and the other in another, and yet the two must concur in order to lay a levy or issue bonds.

Mandamus is a discretionary writ, and to issue it in this case would give an undue advantage to the relator, and operate unjustly against the respondents.

The matter set up in the return of the respondents relative to the cession of the Northwest Territory is an appeal to this court to exercise its discretion against the issuance of the writ herein, under all the circumstances.

If a controversy arises between two States involving a question of boundary, this court applies to the solution of the controversy all the machinery and flexible orders of a court of equity, resulting in the appointment of commissioners for the purpose of ascertaining and monumenting the true boundary, followed by a final decree that extends the jurisdiction of one commonwealth to the line so established, and excludes the jurisdiction of the other from the territory thus covered; and may give final effect to this decree in a thousand and one ways, the particular way being dependent upon the character of the judicial questions that may subsequently spring thereout.

Again, in the event of a final judgment against a State upon bonds issued by her and owned and held by another State, if there be collateral to secure the payment, there is no more difficulty in subjecting it to satisfaction of the judgment than there would be in the case of an individual, and such was the conclusion of this court in *South Dakota* v. *North Carolina*, 192 U. S. 286.

Likewise, in the case of a mere money judgment, the writ would be one of the ordinary writs of execution, and would take its course as in the case of an individual; and the exercise of judicial power involves nothing more. It neither contemplates nor promises the unusual or the forbidden, and incompetence may not be predicated upon such a situation by any one.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

A rule allowed at the instance of Virginia against West Virginia to show cause why, in default of payment of the judgment of this court in favor of the former State against the latter, an order should not be entered directing the levy of a tax by the legislature of West Virginia to pay such judgment, and a motion by West Virginia to dismiss the rule is the matter before us.

In the suit in which the judgment was rendered, Virginia, invoking the original jurisdiction of this court, sought the enforcement of a contract by which it was averred West Virginia was bound. The judgment which resulted was for $12,393,929.50 with interest and it was based upon three propositions specifically found to be established: First, that when territory was carved out of the dominion of the State of Virginia for the purpose of constituting the area of the State of West Virginia, the new State, coincidently with its existence, became bound for and assumed to pay its just proportion of the previous public debt of Virginia. Second, that this obligation of West Virginia was the subject of a contract between the two States, made with the consent of Congress, and was incorporated into the constitution by which West Virginia was admitted by Congress into the Union, and therefore became a condition of such admission and a part of the very governmental fiber of that State. Third, that the sum of the judgment rendered constituted the equitable proportion of this debt due by West Virginia in accordance with the obligations of the contract.

The suit was commenced in 1906 and the judgment rendered in 1915. The various opinions expressed during the progress of the cause will be found in the reported

cases cited in the margin,[1] in the opinion in one of which (234 U. S. 117), a chronological statement of the incidents of the controversy was made.

The opinions referred to will make it clear that both States were afforded the amplest opportunity to be heard and that all the propositions of law and fact urged were given the most solicitous consideration. Indeed, it is also true that in the course of the controversy, as demonstrated by the opinions cited, controlled by great consideration for the character of the parties, no technical rules were permitted to frustrate the right of both of the States to urge the very merits of every subject deemed by them to be material.

And, controlled by a like purpose, before coming to discharge our duty in the matter now before us, we have searched the record in vain for any indication that the assumed existence of any error committed has operated to prevent the discharge by West Virginia of the obligations resulting from the judgment and hence has led to the proceeding to enforce the judgment which is now before us. In saying this, however, we are not unmindful that the record contains a suggestion of an alleged claim of West Virginia against the United States, which was not remotely referred to while the suit between the two States was undetermined, the claim referred to being based on an assumed violation of trust by the United States in the administration of what was left of the great domain of the Northwest Territory—a domain as to which, before the adoption of the Constitution of the United States, Virginia at the request of Congress transferred to the government of the Confederation all her right, title and interest in order to allay discord between the States, as New York had previously done and as Massachusetts, Connecticut, South Carolina, North Carolina and Georgia

---

[1] 206 U. S. 290; 209 U. S. 514; 220 U. S. 1; 222 U. S. 17; 231 U. S. 89; 234 U. S. 117; 238 U. S. 202; 241 U. S. 531.

subsequently did.[1] It is obvious that the subject was referred to, in connection with the duty of West Virginia to comply with the requirements of the judgment, upon the hypothesis that if the United States owed the claim, and if in a suit against the United States recovery could be had, and if West Virginia received its share, it might be used, if sufficient, for discharging the judgment, and thus save West Virginia from resorting to other means for so doing.

That judicial power essentially involves the right to enforce the results of its exertion is elementary. *Wayman* v. *Southard,* 10 Wheat. 1, 23; *Bank of the United States* v. *Halstead,* 10 Wheat. 57; *Gordon* v. *United States,* 117 U. S. 697, 702. And that this applies to the exertion of such power in controversies between States as the result of the exercise of original jurisdiction conferred upon this court by the Constitution is therefore certain. The many cases in which such controversies between States have been decided in the exercise of original jurisdiction make this truth manifest.[2] Nor is there room for con-

---

[1] Gannett, Boundaries of the United States, pp. 24–29.

[2] *New York* v. *Connecticut,* 4 Dall. 1, 3, 6; *New Jersey* v. *New York,* 3 Pet. 461; 5 Pet. 284; 6 Pet. 323; *Rhode Island* v. *Massachusetts,* 7 Pet. 651; 11 Pet. 226; 12 Pet. 657; 13 Pet. 23; 14 Pet. 210; 15 Pet. 233; 4 How. 591; *Massachusetts* v. *Rhode Island,* 12 Pet. 755; *Missouri* v. *Iowa,* 7 How. 660; 10 How. 1; *Florida* v. *Georgia,* 11 How. 293; 17 How. 478; *Alabama* v. *Georgia,* 23 How. 505; *Virginia* v. *West Virginia,* 11 Wall. 39; *Missouri* v. *Kentucky,* 11 Wall. 395; *South Carolina* v. *Georgia,* 93 U. S. 4; *Indiana* v. *Kentucky,* 136 U. S. 479; 159 U. S. 275; 163 U. S. 520; 167 U. S. 270; *Nebraska* v. *Iowa,* 143 U. S. 359; 145 U. S. 519; *Iowa* v. *Illinois,* 147 U. S. 1; 151 U. S. 238; 202 U. S. 59; *Virginia* v. *Tennessee,* 148 U. S. 503; 158 U. S. 267; *Missouri* v. *Iowa,* 160 U. S. 688; 165 U. S. 118; *Tennessee* v. *Virginia,* 177 U. S. 501; 190 U. S. 64; *Missouri* v. *Illinois,* 180 U. S. 208; 200 U. S. 496; 202 U. S. 598; *Kansas* v. *Colorado,* 185 U. S. 125; 206 U. S. 46; *South Dakota* v. *North Carolina,* 192 U. S. 286; *Missouri* v. *Nebraska,* 196 U. S. 23; 197 U. S. 577; *Louisiana* v. *Mississippi,* 202 U. S. 1; *Washing-*

tending to the contrary because, in all the cases cited, the States against which judgments were rendered, conformably to their duty under the Constitution, voluntarily respected and gave effect to the same. This must be unless it can be said that, because a doctrine has been universally recognized as being beyond dispute and has hence hitherto, in every case from the foundation of the Government, been accepted and applied, it has by that fact alone now become a fit subject for dispute.

It is true that in one of the cited cases (*South Dakota* v. *North Carolina*, 192 U. S. 286) it was remarked that doubt had been expressed in some instances by individual judges as to whether the original jurisdiction conferred on the court by the Constitution embraced the right of one State to recover a judgment in a mere action for debt against another. In that case, however, it is apparent that the court did not solve such suggested doubt, as that question was not involved in the case then before it and that subject was hence left open to be passed on in the future when the occasion required. But the question thus left open has no bearing upon and does not require to be considered in the case before us, first, because the power to render the judgment as between the two States whose enforcement is now under consideration is as to them foreclosed by the fact of its rendition. And second, because, while the controversy between the States culminated in a decree for money and that subject was within the issues, nevertheless, the generating cause of the controversy was the carving out of the dominion of one of the States the area composing the other and the resulting and expressly assumed obligation of the newly created State to pay the just proportion of the preëxisting debt, an ob-

---

*ton* v. *Oregon*, 211 U. S. 127; 214 U. S. 205; *Missouri* v. *Kansas*, 213 U. S. 78; *Maryland* v. *West Virginia*, 217 U. S. 1; 217 U. S. 577; 225 U. S. 1; *North Carolina* v. *Tennessee*, 235 U. S. 1; 240 U. S. 652; *Arkansas* v. *Tennessee*, 246 U. S. 158.

ligation which, as we have seen, rested in contract between the two States, consented to by Congress and expressed in substance as a condition in the Constitution by which the new State was admitted into the Union. In making this latter statement we do not overlook the truism that the Union under the Constitution is essentially one of States equal in local governmental power, which therefore excludes the conception of an inequality of such power resulting from a condition of admission into the Union. *Ward* v. *Race Horse,* 163 U. S. 504. But this principle has no application to the question of power to enforce against a State when admitted into the Union a contract entered into by it with another State with the consent of Congress, since such question but concerns the equal operation upon all the States of a limitation upon them all imposed by the Constitution, and the equal application of the authority conferred upon Congress to vivify and give effect by its consent to contracts entered into between States.

Both parties admit that West Virginia is the owner of no property not used for governmental purposes and that therefore, from the mere issue of an execution, the judgment is not susceptible of being enforced if, under such execution, property actually devoted to immediate governmental uses of the State may not be taken. Passing a decision as to the latter question, all the contentions on either side will be disposed of by considering two subjects: first, the limitations on the right to enforce inhering in the fact that the judgment is against a State and its enforcement against such governmental being; and second, the appropriateness of the form of procedure applicable for such enforcement. The solution of these subjects may be disposed of by answering two questions which we propose to separately state and consider.

1. *May a judgment rendered against a State as a State be enforced against it as such, including the right, to the ex-*

*tent necessary for so doing, of exerting authority over the gov-
·ernmental powers and agencies possessed by the State?*

On this subject Virginia contends that, as the Con-
stitution subjected the State of West Virginia to judicial
authority at the suit of the State of Virginia, the judg-
ment which was rendered in such a suit binds and
operates upon the State of West Virginia, that is, upon
that State in a governmental capacity, including all in-
strumentalities and agencies of state power, and indirectly
binding the whole body of the citizenship of that State
and the property which, by the exertion of powers pos-
sessed by the State, are subject to be reached for the
purpose of meeting and discharging the state obligation.
As then, the contention proceeds, the legislature of West
Virginia possesses the power to tax and that body and
its powers are all operated upon by the judgment, the
inability to enforce by means of ordinary process of
execution gives the right and sanctions the exertion of
the authority to enforce the judgment by compelling
the legislature to exercise its power of taxation. The
significance of the contention and its scope are aptly
illustrated by the reference in argument to the many
decided cases holding that, where a municipality is em-
powered to levy specified taxation to pay a particular
debt, the judicial power may enforce the levy of the tax to
meet a judgment rendered in consequence of a default
in paying the indebtedness.[1]

On the other hand, West Virginia insists that the
defendant as a State may not, as to its powers of gov-
ernment reserved to it by the Constitution, be controlled
or limited by process for the purpose of enforcing the

---

[1] *Supervisors* v. *United States*, 4 Wall. 435; *Von Hoffman* v. *City of
Quincy*, 4 Wall. 535; *City of Galena* v. *Amy*, 5 Wall. 705; *Riggs* v. *John-
son County*, 6 Wall. 166; *Walkley* v. *City of Muscatine*, 6 Wall. 481;
*Labette County Commissioners* v. *Moulton*, 112 U. S. 217; *County Com-
missioners of Cherokee County* v. *Wilson*, 109 U. S. 621.

payment of the judgment. Because the right for that end is recognized, to obtain an execution against a State and levy it upon its property, if any, not used for governmental purposes, it is argued, affords no ground for upholding the power, by compelled exercise of the taxing authority of the State, to create a fund which may be used when collected for paying the judgment. The rights reserved to the States by the Constitution, it is further insisted, may not be interfered with by the judicial power merely because that power has been given authority to adjudicate at the instance of one State a right asserted against another, since, although the authority to enforce the adjudication may not be denied, execution to give effect to that authority is restrained by the provisions of the Constitution which recognize state governmental power.

Mark, in words a common premise—a judgment against a State and the authority to enforce it—is the predicate upon which is rested on the one hand the contention as to the existence of complete and effective, and the assertion, on the other, of limited and inefficacious power. But it is obvious that the latter can only rest upon either treating the word state, as used in the premise, as embracing only a misshapen or dead entity, that is, a State stripped for the purpose of judicial power of all its governmental authority, or, if not, by destroying or dwarfing the significance of the word state as describing the entity subject to enforcement, or both. It needs no argument to demonstrate that both of these theories are incompatible with and destructive of the very numerous cases decided by this court to which we have referred. As it is certain that governmental powers reserved to the States by the Constitution—their sovereignty—were the efficient cause of the general rule by which they were not subject to judicial power, that is, to be impleaded, it must follow that, when the Constitution gave original

jurisdiction to this court to entertain at the instance
of one State a. suit against another, it must have been
intended to modify the general rule, that is, to bring
the States and their governmental authority within
the exceptional judicial power which was created.   No
other rational explanation can be given for the provision.
And the context of the Constitution, that is, the ex-
press prohibition which it contains as to the power of
the States to contract with each other except with the
consent of Congress, the limitations as to war and armies,
obviously intended to prevent any of the States from
resorting to force for the redress of any grievance real
or imaginary, all harmonize with and give force to this
conception of the operation and effect of the right to
exert, at the prayer of one State, judicial authority over
another.

But it is in substance said this view must be wrong for
two reasons:   (a) because it virtually overrides the pro-
vision of the Constitution reserving to the States the
powers not delegated, by the provision making a grant
of judicial power for the purpose of disposing of con-
troversies between States; and (b) because it gives to the
Constitution a construction incompatible with its plain
purpose, which was, while creating the nation, yet, at the
same time, to preserve the States with their govern-
mental authority in order that state and nation might en-
dure.   Ultimately, the argument at its best but urges that
the text of the Constitution be disregarded for fear of
supposed consequences to arise from enforcing it.   And
it is difficult to understand upon what ground of reason
the preservation of the rights of all the States can be pred-
icated upon the assumption that any one State may de-
stroy the rights of any other without any power to redress
or cure the resulting grievance.   Nor, further, can it be
readily understood why it is assumed that the preservation
and perpetuation of the Constitution depend upon the ab-

sence of all power to preserve and give effect to the great guarantees which safeguard the authority and preserve the rights of all the States.

. Besides, however, the manifest error of the propositions which these considerations expose, their want of merit will be additionally demonstrated by the history of the institutions from which the provisions of the Constitution under review were derived, and by bringing into view the evils which they were intended to remedy and the rights which, it was contemplated, their adoption would secure.

Bound by a common allegiance and absolutely controlled in their exterior relations by the mother country, the colonies before the Revolution were yet as regards each other practically independent, that is, distinct one from the other. Their common intercourse, more or less frequent, the contiguity of their boundaries, their conflicting claims, in many instances, of authority over undefined and outlying territory, of necessity brought about conflicting contentions between them. As these contentions became more and more irritating, if not seriously acute, the necessity for the creation of some means of settling them became more and more urgent, if physical conflict was to be avoided. And for this reason, it is to be assumed, it early came to pass that differences between the colonies were taken to the Privy Council for settlement and were there considered and passed upon during a long period of years, the sanction afforded to the conclusions of that body being the entire power of the realm, whether exerted through the medium of a royal decree or legislation by Parliament. This power, it is undoubtedly true, was principally called into play in cases of disputed boundary, but that it was applied also to the complaint of an individual against a colony concerning the wrongful possession of property by the colony alleged to belong to him, is not disputed. This general situation as to the disputes between the colonies and the power to dispose of them by

the Privy Council was stated in *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 739, *et seq.*, and will be found reviewed in the authorities referred to in the margin.[1]

When the Revolution came and the relations with the mother country were severed, indisputably controversies' between some of the colonies, of the greatest moment to them, had been submitted to the Privy Council and were undetermined. The necessity for their consideration and solution was obviously not obscured by the struggle for independence which ensued, for, by the Ninth of the Articles of Confederation, an attempt to provide for them as well as for future controversies was made. Without going into detail it suffices to say that that article in express terms declared the Congress to be the final arbiter of controversies between the States and provided machinery for bringing into play a tribunal which had power to decide the same. That these powers were exerted concerning controversies between the States of the most serious character again cannot be disputed. But the mechanism devised for their solution proved unavailing because of a want of power in Congress to enforce the findings of the body charged with their solution, a deficiency of power which was generic, because resulting from the limited authority over the States conferred by the Articles of Confederation on Congress as to every subject. That this absence of power to control the governmental attributes of the States, for the purpose of enforcing findings concerning disputes between them, gave rise to the most serious consequences, and brought the States to the very verge of physical struggle, and resulted in the shedding of blood and would, if it had not been for the adoption of the Constitution of the United States, it

---

[1] Acts of the Privy Council, Colonial Series, vols. I to V, passim; Snow, The Administration of Dependencies, Chap. V and passim; Gannett, Boundaries of the United States, pp. 35, 41, 44, 49-52, 73, 88; Story on the Constitution (5th ed.), §§ 80, 83, 1681.

may be reasonably assumed, have rendered nugatory the great results of the Revolution, is known of all and will be found stated in the authoritative works on the history of the time.[1]

Throwing this light upon the constitutional provisions, the conferring on this court of original jurisdiction over controversies between States, the taking away of all authority as to war and armies from the States and granting it to Congress, the prohibiting the States also from making agreements or compacts with each other without the consent of Congress, at once makes clear how completely the past infirmities of power were in mind and were provided against. This result stands out in the boldest possible relief when it is borne in mind that, not a want of authority in Congress to decide controversies between States, but the absence of power in Congress to enforce as against the governments of the States its decisions on such subjects, was the evil that cried aloud for cure, since it must be patent that the provisions written into the Constitution, the power which was conferred upon Congress and the judicial power as to States created, joined with the prohibitions placed upon the States, all combined to unite the authority to decide with the power to enforce—a unison which could only have arisen from contemplating the dangers of the past and the unalterable purpose to prevent their recurrence in the future. And, while it may not materially add to the demonstration of the result stated, it may serve a useful purpose to direct attention to the probable operation of tradition upon the mind of the framers, shown by the fact that, harmonizing with the practice which prevailed during the colonial period in the

[1] Fiske, The Critical Period of American History, pp. 147 *et seq.;* McMaster, History of the People of the United States, vol. I, pp. 210 *et seq.;* Miner, History of Wyoming.

See also Story on the Constitution (5th ed.), §§ 1679, 1680; 131 U. S., Appendix L.

Privy Council, the original jurisdiction as conferred by the Constitution on this court embraced not only controversies between States but between private individuals and a State—a power which, following its recognition in *Chisholm* v. *Georgia*, 2 Dall. 419, was withdrawn by the adoption of the Eleventh Amendment. The fact that in the Convention, so far as the published debates disclose, the provisions which we are considering were adopted without debate, it may be inferred, resulted from the necessity of their enactment, as shown by the experience of the colonies and by the spectre of turmoil, if not war, which, as we have seen, had so recently arisen from the disputes between the States, a danger against the recurrence of which there was a common purpose efficiently to provide. And it may well be that a like mental condition accounts for the limited expressions concerning the provisions in question in the proceedings for the ratification of the Constitution which followed, although there are not wanting one or two instances where they were referred to which when rightly interpreted make manifest the purposes which we have stated.[1]

The State, then, as a governmental entity, having been subjected by the Constitution to the judicial power under the conditions stated, and the duty to enforce the judgment by resort to appropriate remedies being certain, even although their exertion may operate upon the governmental powers of the State, we are brought to consider the second question, which is:

2. *What are the appropriate remedies for such enforcement?*

Back of the consideration of what remedies are appropriate, whether looked at from the point of view of the exertion of equitable power or the application of legal remedies extraordinary in character (mandamus, etc.,) lies

---

[1] Vol. 2, Elliot's Debates, pp. 462, 490, 527; Vol. 3, pp. 571, 573; The Federalist, No. 81.

the question what ordinary remedies are available, and that subject must. necessarily be disposed of. As the powers to render the judgment and to enforce it arise from the grant in the Constitution on that subject, looked at from a generic point of view, both are federal powers and, comprehensively considered, are sustained by every authority of the federal government, judicial, legislative or executive, which may be appropriately exercised. And, confining ourselves to a determination of what is appropriate in view of the particular judgment in this cause, two questions naturally present themselves: (a) the power of Congress to legislate to secure the enforcement of the contract between the States; and (b) the appropriate remedies which may by the judicial power be exerted to enforce the judgment. We again consider them separately.

(a) *The power of Congress to legislate for the enforcement of the obligation of West Virginia.*

The vesting in Congress of complete power to control agreements between States, that is, to authorize them when deemed advisable and to refuse to sanction them when disapproved, clearly rested upon the conception that Congress, as the repository not only of legislative power but of primary authority to maintain armies and declare war, speaking for all the States and for their protection, was concerned with such agreements, and therefore was virtually endowed with the ultimate power of final agreement which was withdrawn from state authority and brought within the federal power. It follows as a necessary implication that the power of Congress to refuse or to assent to a contract between States carried with it the right, if the contract was assented to and hence became operative by the will of Congress, to see to its enforcement. This must be the case unless it can be said that the duty of exacting the carrying out of a contract is not, within the principle of *McCulloch* v. *Maryland,*

4 Wheat. 316, relevant to the power to determine whether
the contract should be made. But the one is so relevant
to the other as to leave no room for dispute to the con-
trary.

Having thus the power to provide for the execution of
the contract, it must follow that the power is plenary
and complete, limited of course, as we have just said, by
the general rule that the acts done for its exertion must
be relevant and appropriate to the power. This being
true, it further follows, as we have already seen, that, by
the very fact that the national power is paramount in the
area over which it extends, the lawful exertion of its au-
thority by Congress to compel compliance with the obli-
gation resulting from the contract between the two
States which it approved is not circumscribed by the
powers reserved to the States. Indeed, the argument that
the recognition of such a power in Congress is subversive
of our constitutional institutions from its mere statement
proves to the contrary, since at last it comes to insisting
that any one State may, by violating its obligations under
the Constitution, take away the rights of another and
thus destroy constitutional government. Obviously, if
it be conceded that no power obtains to enforce as against
a State its duty under the Constitution in one respect and
to prevent it from doing wrong to another State, it would
follow that the same principle would have to be applied
to wrongs done by other States, and thus the government
under the Constitution would be not an indissoluble
union of indestructible States but a government composed
of States each having the potency with impunity to wrong
or degrade another—a result which would inevitably
lead to a destruction of the union between them. Besides,
it must be apparent that to treat the power of Congress
to legislate to secure the performance by a State of its duty
under the Constitution, that is, its continued respect for
and obedience to that instrument, as coercion, comes back

at last to the theory that any one State may throw off and
disregard without sanction its obligation and subjection
to the Constitution.   A conclusion which brings at once
to the mind the thought that to maintain the proposition
now urged by West Virginia would compel a disregard
of the very principles which led to the carving out of that
State from the territory of Virginia; in other words, to
disregard and overthrow the doctrines irrevocably set-
tled by the great controversy of the Civil War, which in
their ultimate aspect find their consecration in the amend-
ments to the Constitution which followed.

Nor is there any force in the suggestion that the exist-
ence of the power in Congress to legislate for the enforce-
ment of a contract made by a State under the circum-
stances here under consideration is incompatible with the
grant of original jurisdiction to this court to entertain
a suit between the States on the same subject.· The two
grants in no way conflict, but coöperate and coördinate
to a common end, that is, the obedience of a State to the
Constitution, by performing the duty which that in-
strument exacts.   And this is unaffected by the fact that
the power of Congress to exert its legislative authority,
as we have just stated it, also extends to the creation of
new remedies in addition to those provided for by § 14
of the Judiciary Act of 1789 (1 Stat. 81, c. 20, now § 262,
Judicial Code) to meet the exigency occasioned by the
judicial duty of enforcing a judgment against a State
under the circumstances as here disclosed.   We say this
because we think it is apparent that to provide by legis-
lative action additional process relevant to the enforcement
of judicial authority is the exertion of a legislative and
not the exercise of a judicial power.

This leaves only the second aspect of the question now
under consideration.

(b) *The appropriate remedies under existing legislation.*
The remedy sought, as we have at the outset seen, is

an order in the nature of mandamus commanding the
levy by the legislature of West Virginia of a tax to pay
the judgment. In so far as the duty to award that remedy
is disputed merely because authority to enforce a judg-
ment against a State may not affect state power, the
contention is adversely disposed of by what we have
said. But this does not dispose of all the contentions
between the parties on the subject, since, on the one hand,
it is insisted that the existence of a discretion in the legis-
lature of West Virginia as to taxation precludes the possi-
bility of issuing the order, and on the other hand it is
contended that the duty to give effect to the judgment
against the State, operating upon all state powers, ex-
cludes the legislative discretion asserted and gives the
resulting right to compel. But we are of opinion that we
should not now dispose of such question and should
also now leave undetermined the further question, which,
as the result of the inherent duty resting on us to give
effect to the judicial power exercised, we have been led
to consider on our own motion, that is, whether there is
power to direct the levy of a tax adequate to pay the
judgment and provide for its enforcement irrespective
of state agencies. We say this because, impelled now
by the consideration of the character of the parties
which has controlled us during the whole course of the
litigation, the right judicially to enforce by appropriate
proceedings as against a State and its governmental
agencies having been determined, and the constitutional
power of Congress to legislate in a two-fold way having
been also pointed out, we are fain to believe that, if
we refrain now from passing upon the questions stated,
we may be spared in the future the necessity of exert-
ing compulsory power against one of the States of
the Union to compel it to discharge a plain duty resting
upon it under the Constitution. Indeed, irrespective of
these considerations, upon the assumption that both the re-

quirements of duty and the suggestions of self-interest may fail to bring about the result stated, we are nevertheless of the opinion that we should not now finally dispose of the case, but because of the character of the parties and the nature of the controversy—a contract approved by Congress and subject to be by it enforced—we should reserve further action in order that full opportunity may be afforded to Congress to exercise the power which it undoubtedly possesses.

Giving effect to this view, accepting the things which are irrevocably foreclosed—briefly stated, the judgment against the State operating upon it in all its governmental powers and the duty to enforce it viewed in that aspect—, our conclusion is that the case should be restored to the docket for further argument at the next term after the February recess. Such argument will embrace the three questions left open: 1. The right under the conditions previously stated to award the mandamus prayed for; 2. If not, the power and duty to direct the levy of a tax as stated; 3. If means for doing so be found to exist, the right, if necessary, to apply such other and appropriate equitable remedy, by dealing with the funds or taxable property of West Virginia or the rights of that State, as may secure an execution of the judgment. In saying this, however, to the end that, if, on such future hearing provided for, the conclusion should be that any of the processes stated are susceptible of being lawfully applied (repeating that we do not now decide such questions), occasion for a further delay may not exist, we reserve the right, if deemed advisable, at a day hereafter before the end of the term or at the next term before the period fixed for the hearing, to appoint a master for the purpose of examining and reporting concerning the amount and method of taxation essential to be put into effect, whether by way of order to the state legislature or direct action, to secure the full execution of the

judgment, as well as concerning the means otherwise existing in the State of West Virginia, if any, which, by the exercise of the equitable powers in the discharge of the duty to enforce payment, may be available for that purpose.

*And it is so crdered.*