537 F.Supp. 388 (1982)
UNITED STATES of America, Plaintiff,
v.
STATE OF WEST VIRGINIA, Defendant.
Civ. A. No. 78-2049.
United States District Court, S. D. West Virginia, Charleston Division.
January 28, 1982.
*389 Tracy Whitaker, Thomas W. B. Porter, U. S. Dept. of Justice, Washington, D. C., for plaintiff.
Richard L. Earles, Asst. Atty. Gen., Charleston, W. Va., for defendant.

MEMORANDUM ORDER
COPENHAVER, District Judge.
This case comes before the court on plaintiff's motion for summary judgment and defendant's motion to dismiss. Because of the extensive affidavits, exhibits and memoranda submitted by both parties, the court has chosen to treat defendant's motion to dismiss as a motion for summary judgment. Rules 12(b)(6) and 56, Federal Rules of Civil Procedure. The parties were so informed and have since submitted additional material in support of their positions.

I.
Many of the incidents which form the factual basis for this contractual claim by the United States against the State of West Virginia are well-documented and not disputed by the parties. Two floods, and the disasters they caused, are involved. On February 26, 1972, heavy rains and resulting floods caused the collapse of a coal waste dam on Buffalo Creek, a tributary of the Middle Fork River near Man, in Logan County, in the southwestern corner of West Virginia. Many lives were lost and much property destroyed in this calamity, which became known as the Buffalo Creek disaster. Later that year, froAugust 17 through August 20, electrical storms and *390 driving rains caused widespread flooding and mudslides in four counties, also in the southwestern corner of West Virginia. The damage and disruption caused by these storms became known as the Gilbert Creek disaster.
The executive branches of both the national and state governments responded quickly after each disaster to provide relief for the survivors and the dispossessed. President Nixon declared both calamities to be "major disasters," bringing both areas within the ambit of the Disaster Relief Act of 1970 (Public Law 91-606, 84 Stat. 1744, repealed Pub.L. 93-288, 88 Stat. 164 [1974]), thus qualifying the affected locales for federal disaster relief assistance. West Virginia's then governor, Arch A. Moore, Jr., proclaimed the existence of a state of emergency, thereby activating the emergency powers of the governor enumerated in W.Va.Code § 15-5-6 and setting in motion other emergency measures enumerated in the Emergency Services article of the West Virginia Code, § 15-5-1 et seq.
Procuring temporary housing for those whose homes were destroyed was a major element of the relief effort. Section 226(a) of the Disaster Relief Act of 1970, then in effect, authorized the federal government to furnish mobile homes and other forms of emergency shelters, to be placed on sites supplied, along with utilities, by individual citizens or by the state or local governments. Pub.L. 91-606, 84 Stat. 1752 (1970), repealed Pub.L. 93-288, 88 Stat. 164 (1974) (quoted in Part IV, below).
The Army Corps of Engineers, in its capacity as the federal executive agency responsible for the cleanup operations, began work at the Buffalo Creek location as soon as the flood waters receded, prior to the construction of temporary housing. In response to the immediate need for temporary shelter, Governor Moore's representative, John M. Gates, through his deputy, Fred C. Allen, Jr., asked the Corps, with its work crews already in place at the Buffalo Creek disaster site, to undertake the preparation of sites for mobile homes and installation of utilities in addition to their cleanup tasks. After some negotiations, the Corps consented to do the work. Thereafter, for each site for mobile homes, Mr. Gates sent a short written request for the work to the Corps, simply naming the proposed site, acknowledging the State's responsibility for providing such sites and utilities, and promising to be responsible for the costs incurred by the Corps in performing the requested work.[1] *391 Similar arrangements were made later in the year in the wake of the Gilbert Creek disaster.
The Corps performed all the work requested by state officials at both sites. Copies of maps of the areas involved, of the letters from Mr. Gates to the Corps, and of a "Release" dated June 2, 1972, and signed for the State by Mr. Gates acknowledging the satisfactory completion of the work at the Buffalo Creek sites and assuming responsibility for those sites, were submitted to the court with the United States' motion for summary judgment. West Virginia acknowledges the authenticity of the correspondence and the release.
The State has countered, however, with the affidavit of former Governor Moore, filed on November 2, 1981, wherein the affiant states that as Governor he neither approved nor authorized the written requests or the Release by Mr. Gates to the Corps. Governor Moore further avers that Mr. Gates had neither express nor implied authority from him as Governor "to legally or otherwise financially join or otherwise contract with or between the State of West Virginia and the U. S. Corps of Engineers."
In letters dated 27 October 1972 and 27 February 1973, the Corps submitted bills to the Governor's office for work performed on the Buffalo Creek site in the amount of $3,708,412.62. The bill for work on the Gilbert Creek site in the amount of $633,377.41 was bmitted by letter dated 15 May 1973. Additional correspondence passed between the Governor's office and the Corps regarding the bills, but no payment was made and no agreements for payment were made. The latest letter from the Corps to Governor Moore's administration requesting payment is dated May 12, 1975; no correspondence with the subsequent administration of Governor John D. Rockefeller, IV, if any there was, has been filed. Copies of the bills and subsequent correspondence were submitted to the court with the United States' motion for summary judgment, and West Virginia acknowledges their authenticity. The United States also submitted an affidavit in support of its motion by Lawrence W. Morrison, Emergency Operations Planner for the Corps of Engineers at the time of the Buffalo Creek disaster, from which most of the preceding account is taken.
The United States requests judgment against the State of West Virginia in the amount of $4,341,790.03, the sum allegedly due and owing in payment for work performed and services rendered in preparing sites for temporary housing for victims of the Buffalo Creek and Gilbert Creek disasters, plus interest and costs.

II.
The district courts have "original jurisdiction of all civil actions ... commenced by the United States." 28 U.S.C. § 1345, 62 Stat. 933 (1948). This grant of general jurisdiction includes all justiciable actions brought by the United States against a state. United States v. California, 328 F.2d 729 (9th Cir. 1964), cert. denied, 379 U.S. 817, 85 S.Ct. 34, 13 L.Ed.2d 29 (1964).[2] The district courts share concurrent jurisdiction over such cases with the United States Supreme Court. 28 U.S.C. § 1251(b)(2).
West Virginia argues that its state constitutional immunity to suit precludes this court's exercise of jurisdiction over the *392 controversy.[3] Yet, since United States v. Texas, 143 U.S. 621, 12 S.Ct. 488, 36 L.Ed. 285 (1892), the Supreme Court has held that its original jurisdiction extends to suits brought by the United States against states with or without their consent.[4] The susceptibility of states to civil actions brought by another state or the federal government, despite their pleas of sovereign immunity, arises out of the very structure of the nation's government and the need for a forum for resolving inter-governmental disputes. It is "inherent in the constitutional plan." Monaco v. Mississippi, 292 U.S. 313, 329, 54 S.Ct. 745, 750, 78 L.Ed. 1282 (1934). The same structural theory which compels the conclusion that state sovereign immunity does not bar a suit brought originally by the federal government in the Supreme Court leads to the similar conclusion that sovereign immunity is not a bar in the federal district courts. United States v. Illinois, supra at 301. Indeed!, practical considerations may make the district courts a more preferable forum than the Supreme Court. As the Ninth Circuit observed, after holding that California's sovereign immunity did not bar suits for damages in tort by the United States,
Suits by the United States against States, until recently rare, are not now uncommon, and must inevitably increase with the broader activities of both the national government and the governments of the States. Common sense dictates that those suits which involve routine, largely factual disputes be litigated in the district courts, and that the jurisdiction of the Supreme Court be invoked initially only in those rare cases which present large issues.
United States v. California, supra at 739 (footnotes omitted).[5] The Supreme Court expressed similar sentiments in United States v. Nevada, 412 U.S. 534, 93 S.Ct. 2763, 37 L.Ed.2d 132 (1973) (per curiam), in which the Court declined to exercise its original jurisdiction in a dispute over water rights when the district court was an equally hospitable forum. See alsIllinois v. Milwaukee, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972).
The case before this court, basically a contracts claim, is precisely the sort of factual dispute which the Supreme Court has indicated should be litigated in the district courts. Accordingly, the court holds that West Virginia's state constitutional immunity from suit does not prevent this court from exercising original jurisdiction over the controversy at bar.
West Virginia also argues that this court lacks the authority to enforce a decree against a state, citing Virginia v. West Virginia, 246 U.S. 565, 38 S.Ct. 400, 59 L.Ed. 1272 (1918), and contends that the lack of power to enforce an order renders this case nonjusticiable. The argument is flawed in two respects. First, even when execution on a judgment appears impossible, judgments can and should be rendered. Thus, in FHA v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724 (1940), where it was conceded that federal sovereign immunity would act as an absolute bar to enforcement, Justice Douglas wrote for the Court:

*393 But that is an inherent limitation, under this statutory scheme, on the legal remedies which Congress has provided ... The fact that execution may prove futile is one of the notorious incidents of litigation, as is the fact that execution is not an indispensable adjunct of the judicial process.
309 U.S. at 251, 60 S.Ct. at 493. See also cases cited at 309 U.S. 251, n.14, 60 S.Ct. at 493, n.14.
Secondly, West Virginia errs in arguing that this court lacks the authority to enforce its decree against a state. In advancing this argument, West Virginia misconstrues Virginia v. West Virginia. In 1915, Virginia obtained a judgment against West Virginia on a debt arising out of West Virginia's separation from Virginia to become a state in 1863. Virginia v. West Virginia, 238 U.S. 202, 35 S.Ct. 795, 59 L.Ed. 1272 (1915). Judgment was rendered despite the presence of problems with execution identical to those in the instant case. When West Virginia failed to pay on the judgment, Virginia sought execution. The Supreme Court held that it had a right to enforce its judgment against a state, but deferred deciding on the method of enforcement until the next term of court. Virginia v. West Virginia, 246 U.S. 565, at 600 and 604-605, 38 S.Ct. 400, at 405 and 406, 59 L.Ed. 1272 (1918). The West Virginia legislature acted to satisfy the judgment before the next term. See 1919 W.Va.Acts (Ext. Sess.) ch. 10, p. 19. See also the discussion of the case at 11 Stan.L.Rev. 665, 690-94 (1959).
The series of decisions handed down during the West Virginia litigation thus stands for the proposition that the Supreme Court, as a necessary corollary to its original jurisdiction over certain controversies involving states as parties, possesses the power to enforce its judgments in those cases. Decrees in many cases are self-executing;[6] injunctions and mandamus have been directed to state officials by lower federal courts as well as the Supreme Court, when the remedial measures were within the scope of the officials' duty and authority. See Nebraska v. Wyoming, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945), and cases cited at 11 Stan.L.Rev. 665, 692-93 (1959). The Supreme Court has never specifically ordered execution of a money judgment against a state in favor of another state or the federal government, and the method by which enforcement would be achieved has, therefore, not been delineated by the Court. But case law development at this stage leads ineluctably to the conclusion that the Supreme Court and, in turn, other federal courts with concurrent jurisdiction over federal-state disputes, possess the power to enforce their judgments against states. See 11 Stan.L.Rev. 665 at 693 (discussing mandamus and the possibility of withholding federal appropriatio).
The West Virginia litigation also stands for the more elemental and significant proposition that the states should never force the federal courts to exert that power. See 11 Stan.L.Rev. 665, 693 (1959) and C. Wright, Federal Courts, page 563 (1976). Short of armed conflict, the lower federal courts and the Supreme Court are the only appropriate forums for resolving disputes among the governments which constitute our federal system. Judgments handed down by the Supreme Court are by their very nature entitled to respect and compliance. As the Court held early in this nation's history, when Massachusetts argued that execution against a state in a boundary dispute was impossible without Congressional action, and that the cause of action was therefore barred:
This court cannot presume, that any state which holds prerogative rights for the good of its citizens, and by the constitution has agreed that those of any other state shall enjoy rights, privileges and *394 immunities in each, as its own do, would either do wrong, or deny right to a sister state or its citizens, or refuse to submit to those decrees of this court, rendered pursuant to its own delegated authority.
Rhode Island v. Massachusetts, 37 U.S. (12 Peters) 657 (1838). West Virginia's legislature complied with the Supreme Court's order in 1919 when the Court had exclusive jurisdiction over such controversies; there is no reason to believe that it would not comply today with a judgment of this federal court of original jurisdiction, either as handed down or, if appealed, as ultimately reviewed by the Court of Appeals and the Supreme Court.

III.
Having decided that it has jurisdiction, the court turns to the question of whether federal or state law governs. Although expositions of the rationale are virtually nonexistent, commentary and case law involving suits by the United States against the several states under the jurisdictional grant of 28 U.S.C. § 1345 uniformly indicate that federal law controls such actions. "Most opinions simply assume that federal law controls disputes between the United States and a state." 17 Wright & Miller § 4052, n.20 (1978) (discussing the Supreme Court's original jurisdiction and citing Chief Justice Hughes in United States v. Utah, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931)). See also United States v. State of California, 655 F.2d 914 (1980); and 1A Moore's Federal Practice § 0.320 (1979). The reasoning apparently is that, just as suits between states are decided according to federal law because it would be improper to subject one sovereign state to the rule of another equally sovereign state,[7] so should controversies between the federal government and a state government be resolved according to federal law because of the political and structural impossibility of subjecting the whole to the law of one of its parts. See Note, "The Federal Common Law," 82 Harv.L.Rev. 1512, 1520 (1969) and C. Wright, Federal Courts, 562 (3rd ed. 1976).
In addition, since the action involves a federal program authorized by the Disaster Relief Act of 1970, federal law should control, without regard to the identity of the defendant. The Supreme Court "has consistently held that federal law governs questions involving the rights of the United States arising under nationwide federal programs." United States v. Kimbell Foods, Inc., 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979), referring to the seminal case of Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).[8]See United States v. Little Lake Misere Land Co., 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973), and Friendly, "In Praise of Erie  and of the New Federal Common Law," 39 N.Y.U.L. Rev. 383 (1964). Accordingly, the court holds that federal law governs this action.
Because the Disaer Relief Act of 1970 contains no directives regarding substantive rules, the next and more difficult question involves fashioning the content of the applicable federal law. This case arises out of a contractual dispute.[9] The court must decide whether to apply federal common law or to incorporate West Virginia's law of contracts as the federal rule of decision regarding the rights and duties of the parties. This decision is the second step in the *395 Clearfield analysis,[10] necessary because "controversies directly affecting the operations of federal programs, although governed by federal law, do not inevitably require resort to uniform federal rules." United States v. Kimbell Foods, supra, 440 U.S. at 727-28, 99 S.Ct. at 1457. The decision involves a balancing of federal and state interests. "The answer to be given necessarily is dependent upon a variety of considerations always relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." United States v. Standard Oil, 332 U.S. 301, 309-10, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947), quoted in United States v. Little Lake, supra, 412 U.S. at 595, 93 S.Ct. at 2398, and United States v. Kimbell Foods, supra at 728, 99 S.Ct. at 1458. See United States v. State of California, 655 F.2d 914, 917 (9th Cir. 1980). Those relevant considerations were recently articulated by the Supreme Court in United States v. Kimbell Foods, supra at 728-29, 99 S.Ct. at 1457:
Undoubtedly, federal programs that "by their nature are and must be uniform in character throughout the Nation" necessitate formulation of controlling federal rules. United States v. Yazell, 382 U.S. 341, 354 [86 S.Ct. 500, 507, 15 L.Ed.2d 404] (1966); ... (cites omitted). Conversely, when there is little need for a nationally uniform body of law, state law may be incorporated as the federal rule of decision. Apart from considerations of uniformity, we must also determine whether application of state law would frustrate specific objectives of the federal programs. If so, we must fashion special rules solicitous of those federal interests. Finally, our choice of law inquiry must consider the extent to which application of a federal rule would disrupt commercial relationships predicated on state laws. (Footnotes omitted).
West Virginia urges this court to incorporate state law as the governing rule. West Virginia cites United States v. Yazell, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), for the proposition that state law controls. To the same effect is the more recent case of United States v. Kimbell Foods, supra. Both cases hold that the federal government's involvement in various consumer financial transactions (Small Business Administration loans in Yazell, SBA and Farmer's Home Administration loans in Kimbell Foods) is governed by state law, incorporated as the federal rule of decision. The court observes that the arguments for conformity to state law when the federal government is operating on a local level and dealing with individual citizens are compelling. But such cases are materially different from the case at hand. Both Yazell and Kimbell involved small transactions, routinely engaged in by government agencies with many offices in the several states, acting as lenders to individuals. Neither involved the relations between two governments. Both arose out of acts performed under the auspices of statutes which specifically directed conformity to state law. Creating federal rules contrary to existing state rules in either case would have created unnecessary exceptions to state commercial laws and confronted individual borrowers with a lack of uniformity among procedures employed by lending institutions. Thus, actions arising out of such federal programs are governed by state law incorporated as the federal rule odecision.
However, actions like those in this case, undertaken in response to the immediate needs of many disaster victims and affecting the operation of the federal relief program, are subject to different considerations. The Disaster Relief Act authorized the United States government to react quickly to major catastrophes with "special measures, designed to assist the efforts of the affected States in expediting the rendering of aid, assistance, and emergency welfare services, and the reconstruction and rehabilitation of devastated areas ...." Disaster Relief Act of 1970, supra, § 101(a). *396 Disasters are not confined in their impact by state boundaries, nor do they often give sufficient warning to enable relief planners to sort out foreseeable legal problems. To be effective, the federal government must move with celerity, as the Corps of Engineers did in undertaking the site preparation work in this case. It cannot afford the time required to draft agreements which take into account each state's laws. Treating the federal administrators as if they had the time to do so would be unreasonable. In short, uniformity in these circumstances is essential, given the nature of the program and the prospect of frustrating its objectives if state laws control.
Furthermore, the fact that the federal and state governments were acting (and interacting) as sovereigns militates in favor of a federal rule of decision. The Disaster Relief Act represented a federal policy determination that the whole nation would contribute to the aid of any section of the country suffering the effects of a disaster. It provided for coordination of federal and state relief efforts, in order to effectuate the federal policy of swift and immediate relief, free of the ordinary administrative and bureaucratic restraints. Coordination in this case involved using the Corps to construct sites for temporary housing. In order to achieve these policy goals, and to meet the need for uniformity as discussed, a federal rule must control. See 82 Harv.L. Rev. 1512, 1526-31 (1969).
It would seem unwise to hold that all actions between the federal and state governments should be governed by federal common law simply because a state is involved. The proliferation of federal agencies and programs which interact with state and local governments will almost certainly produce situations where state law should be incorporated as a rule of decision. See, for instance, United States v. State of California, 655 F.2d 914 (9th Cir. 1980). Similarly, it would be imprudent to hold that all controversies arising out of federal actions authorized by the Disaster Relief Act of 1970 are governed by federal law. For instance, in addition to authorizing immediate emergency measures, the Act authorized the federal government, following initial relief efforts, to assist individuals in their efforts to obtain aid through the Small Business Administration (Section 231), the Farmer's Home Administration (Section 232) and the Veterans Administration (Section 233). Loans made through those agencies are and ought to be governed by borrowed state law under Yazell and Kimbell Foods, even when made in response to a disaster. But the drastic emergency measures sanctioned by the Act, like those undertaken in this case, are not controlled by state law incorporated as the rule of decision. In cases like the one at hand, the very nature of the Act and the scope of the swift relief actions it authorizes make uniformity imperative. Therefore, the court will look to the general, federal law of contracts to resolve this controversy.

IV.
Plaintiff argues that West Virginia has a contractual or quasi-contractual obligation to reimburse the Corps of Engineers or, in the alternative, that West Virginia has a statutory duty to reimburse the Corps for the work it performed.
The court rejects the statutory argument. The Uted States contends that the Disaster Relief Act of 1970 confers rights and duties on the parties, citing the Act in its brief as follows in support of its argument:
Any mobile home or readily prefabricated dwelling shall be placed on a site complete with utilities provided by State or local government * * * without charge to the United States. 84 Stat. 1752.
However, by filling in the asterisks, and adding the sentence which follows the quote, a different picture emerges:
Any mobile home or readily fabricated dwelling shall be placed on a site complete with utilities provided by State or local government, or by the owner or occupant of the site who was displaced by the major disaster, without charge to the United States. However, the Director may elect to provide other more economical *397 and accessible sites at Federal expense when he determines such action to be in the public interest.
Disaster Relief Act of 1970, § 226(a); 84 Stat. 1752. The statute indicates that the preferable course of conduct involves provision of the site by someone other than the federal government, but obviously anticipates exigencies in which federal funding would occur. The intent is clear, yet the language is not compulsory. Consequently, the court concludes that the statute does not impose liability upon the state, and therefore does not give rise to a cause of action. The State's liability, if any, arises out of the communications and agreements between the parties which form the basis for the contractual and quasi-contractual claims.
As to the contractual-based contentions, the uncontradicted evidence in the case reveals the following communications between the parties. Between March 1, 1972, and May 15, 1972, following the Buffalo Creek disaster, Mr. Gates sent ten letters to the Corps, as discussed in Part I above, requesting work on mobile home sites, including utilities, and vehicular bridges, and one special letter, dated April 12, 1972, assuring the Corps of the State's promise to provide easements and rights-of-way, to hold and save the United States harmless from causes of action arising out of the construction, to maintain the mobile home sites and bridges, and to be responsible for all costs incurred. On June 2, 1972, Mr. Gates signed a release acknowledging the inspection and satisfactory completion of the work at Buffalo Creek and assuming on behalf of the State responsibility for the newly-constructed facilities. Similarly, by letter dated September 5, 1972, following the Gilbert Creek disaster, Mr. Gates requested that the Corps construct a mobile home site on federally-owned property near the Gilbert Creek disaster area. West Virginia acknowledges, by stipulation, the authenticity of all the correspondence and the release described above.
Plaintiff contends that these documents and the affidavit of Law!rence W. Morrison constitute proof of an agreement between the Corps of Engineers and the State of West Virginia. Defendant, however, argues that the Governor, whether acting directly or through Mr. Gates as the Director of Emergency Planning, had no authority to enter into such contracts, and that the contracts are therefore unenforceable.
Defendant further contends that Governor Moore's affidavit of October 8, 1981, filed on November 2, 1981, plainly shows that he neither authorized nor approved the written requests or the Release by Mr. Gates to the Corps. As earlier noted, Governor Moore further avers that Mr. Gates had neither express nor implied authority from him as Governor "to legally or otherwise financially join or otherwise contract with or between the State of West Virginia and the U. S. Corps of Engineers." Moreover, defendant insists that the letters upon which plaintiff relies to prove the contracts were not intended to be binding offers or contracts, but were understood by the State's employees to be mere formalities required to request federal aid andssistance.
On this record, material issues of fact remain in dispute regarding the events which culminated in the performance of work by the Corps of Engineers. Therefore, summary judgment as to liability is inappropriate.

V.
Although summary judgment cannot be rendered on the whole case, material facts relating to the amount of damages are not in dispute, and may therefore be deemed established for the duration of this litigation. Federal Rules of Civil Procedure 56(d). The Morrison affidavit establishes that the amounts in controversy  the principal sums due, exclusive of interest  are $3,708,412.62 for the work performed at Buffalo Creek and $633,377.41 for the work performed at Gilbert Creek.[11]
*398 In response, the State has produced no evidence which indicates any dispute about the amount in controversy. The record is devoid of any references to improper billing, inaccurate calculations, or charges for unnecessary or unperformed work. West Virginia's only response to the United States' evidence on the amount in controversy is set forth in a letter dated October 23, 1981, from counsel for the State to the court.[12] In that letter, the State notes that the Corps of Engineers "Work Order/Completion Report" forms indicate that the original estimated cost of the Corps' work was $1,500,000 for Buffalo Creek and $500,000 for Gilbert Creek. The State contends that the differences between these estimates and the final bills cast doubt on the reasonableness of the Corps' charges. The letter states, at page 2, that:
It is, therefore, the defendant's position that the only evidence the State has at this time to deny "reasonableness" is the government's own work/order completion reports.
No additional evidence has been submitted since this letter was filed.
The State has failed to establish that any genuine issue of material fact on this score exists. Its reliance on the Corps' forms is misplaced. Those forms indicate that Mr. Morrison's original estimate of the cost of the Buffalo Creek work was, indeed, $1,500,000, and that he made that estimate on March 1, the day of Mr. Gates' first letter to the Corps. The earliest form to include that figure is dated March 20, 1972, less than a month after the flood. As the requests by Mr. Gates for specific mission assignments were issued, the Corps forms reflect an increase in the cost estimate. The form dated March 31, 1972, shows an estimated cost of $2,100,000; the April 21, 1972, form shows an estimate of $2,800,000; and the April 30, 1972, form estimates a total cost of $3,100,000. Following the April 30, 1972, form, the last of Mr. Gates' requests for work at Buffalo Creek appears under date of May 2, 1972. Thereafter, the estimates on the Corps forms rose to $3,285,000 on August 25, 1972, and $3,720,000 on September 25, 1972. The final estimate on Buffalo Creek was $3,710,000 on December 27, 1972, roughly $1,500 more than the bill. Similarly, the original estimate of the cost of the Gilbert Creek work was $500,000; the final estimate was $640,000, $7,000 more than the bill.
These estimates provide no basis for challenging the reasonableness or accuracy of the bills which are the subject of this dispute. The bills represent the actual cost of the work to the Corps and, as indicated above, stand uncontradicted as accurate accounts of the value of the work performed. Nearly all of the work was contracted out by the Corps at a cost of $4,145,501.96, with another $174,041.09 representing hired labor and the balance being a charge by the Corps of $22,246.98 for overhead.[13] The original estimate on each the Buffalo Creek and Gilbert Creek jobs was made by the Corps upon receipt of the State's initial request and was revised as the State issued additional requests for specific mission assignments and as work progressed.
In addition, the estimates were not communicated to the State at the time ofhe disasters, and thus the State cannot claim to have relied on the estimates in such a way as to limit its liability. Proof of this is established by plaintiff's response to defendant's second set of interrogatories, *399 which states that the estimates were not disclosed to any employee of the State of West Virginia until the Corps mailed them to Miles Dean, State Commissioner of Finance and Administration, in 1978. The State's own evidence corroborates this fact by containing a copy of a letter dated June 2, 1978 from Edward W. Eversole, District Counsel for the Corps of Engineers, transmitting the "Work Order/Completion Report" forms and other documents to Mr. Dean.[14] Indeed, counsel for West Virginia acknowledges in his letter of October 23, 1981, that after searching all the available files, he was unable to find "any correspondence by the Corps to any State official indicating the original cost estimate or any subsequent cost overruns."[15]
For these reasons, the court finds that the estimates provide no basis for challenging the amount in dispute, and that the State was unaware of the estimates prior to June of 1978. The court therefore finds that there is no dispute regarding the amounts in controversy and that these principal amounts are $3,708,412.62 for Buffalo Creek and $633,377.41 for Gilbert Creek. The questions of when these amounts became due and what, if any, interest is due remain to be resolved.

VI.
Accordingly, for the reasons set forth above, it is ORDERED that the parties' cross-motions for summary judgment be, and they hereby are, denied.
It is further ORDERED that the principal amounts in controversy, $3,708,412.62 for Buffalo Creek and $633,377.41 for Gilbert Creek, be deemed established for purposes of this litigation.
NOTES
[1] The letters followed a standard form. The letter reproduced below contains typical examples of the brief nature of the requests and promises:
 EXECUTIVE OFFICE OF THE GOVERNOR
 OFFICE OF EMERGENCY PLANNING
 CHARLESTON, W. VA. 25305
JOHN M. GATES ARCH A. MOORE, JR. FRED C. ALLEN, JR.
 Director Governor Deputy Director
 March 23, 1972
Colonel Kenneth R. McIntyre
District Engineer
U. S. Corps of Engineers
Huntington, West Virginia 25701

Dear Colonel McIntyre:
Please void my letter of March 22, 1972.
It is respectfully requested that the Huntington District, on a mission assignment for this office, completely prepare a mobile home site at MacDonald Site # 2. This preparation is to include all necessary utility installation and construct an approach bridge and access way to the bridge.
As this is the State's responsibility, this office will be responsible for costs incurred for this assignment.
 Sincerely,
 /s/ John M. Gates
 John M. Gates
 Governor's Authorized Representative

[2] See also United States v. Illinois, 454 F.2d 297 (7th Cir. 1971); Note, the Original Jurisdiction of the United States Supreme Court, 11 Stan.L. Rev. 655 at 670 (1959); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and The Federal System 250-51 (2d ed., 1973). For a perceptive review of the history and problems of federal jurisdiction over controversies between the national government and state governments, see United States v. California, supra.
[3] The state's sovereign immunity is expressed in the Constitution of West Virginia, Article 6, § 35, as amended Nov. 3, 1936, which provides that:

The State of Westirginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee.
[4] See C. Wright, Federal Courts, 558 (3rd ed. 1976). See also 11 Stan.L.Rev. 655, 701-04 (1959) for a list of all cases arising under the Supreme Court's original jurisdiction, brought before 1959 by the United States against a state. The converse is not true; that is, the United States cannot be sued by the states without its consent. Kansas v. United States, 204 U.S. 331, 342, 27 S.Ct. 388, 391, 51 L.Ed. 510 (1907).
[5] Accord, United States v. Illinois, supra; see United States v. Nevada Tax Commission, 439 F.2d 435 (9th Cir. 1971); and Note, "District Court Jurisdiction," 38 N.Y.U.L.Rev. 405 (1963).
[6] Boundary disputes are a primary example. See Illinois v. Missouri, 399 U.S. 146, 90 S.Ct. 2187, 26 L.Ed.2d 487 (1970); Louisiana v. Mississippi, 384 U.S. 24, 86 S.Ct. 1250, 16 L.Ed.2d 330 (1966); New Mexico v. Colorado, 364 U.S. 296, 81 S.Ct. 267, 5 L.Ed.2d 89 (1960); United States v. Texas, 162 U.S. 1, 16 S.Ct. 725, 40 L.Ed. 867 (1896) (boundary between a state and a territory); and other cases listed at 11 Stan.L. Rev. 701, 708-18 (1959).
[7] See Connecticut v. Massachusetts, 282 U.S. 660, 670, 51 S.Ct. 286, 289, 75 L.Ed. 602 (1931), and West Virginia ex rel. Dyer v. Sims, 341 U.S. 22, 71 S.Ct. 557, 95 L.Ed. 713 (1951).
[8] Clearfield held that "In the absence of an applicable Act of Congress, it is for the federal courts to fashion the governing rule of law according to their own standards." Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1942), cited in United States v. Allegheny County, 322 U.S. 174, 183, 64 S.Ct. 908, 913, 88 L.Ed. 1209 (1944); United States v. Standard Oil, 332 U.S. 301, 305, 67 S.Ct. 1604, 1606, 91 L.Ed. 2067 (1947); United States v. Little Lake, supra, 412 U.S. at 594, 93 S.Ct. at 2397; and United States v. Kimbell Foods, supra, 440 U.S. at 727, 99 S.Ct. at 1457.
[9] See Part IV, infra, at pp. 396 397.
[10] See note 7, supra. The Clearfield court opted for uniformity and a federal rule, a decision often criticized, and once called "the big mistake." Note, "The Federal Common Law," 82 Harv.L.Rev. 1512, 1526 (1969).
[11] These amounts are documented by Exhibits O, P and Q to the Morrison affidavit. Exhibit O includes a partial bill for Buffalo Creek in the amount of $3,574,585.00; Exhibit P includes an additional bill for Buffalo Creek in the amount of $133,827.62; and Exhibit Q contai!ns the $633,377.41 bill for the Gilbert Creek work.
[12] This letter is included in materials filed as the State's Supplemental Response to Government Interrogatories 9-12.
[13] These figures are derived from the information supplied by Edward W. Eversole, for the Corps, to Miles Dean of the West Virginia Department of Finance and Administration, as discussed in the text. In greater detail, the Buffalo Creek bills consist of charges of $20,329.43 for overhead; $158,237.81 for hired labor; and payments to seven contractors totalling $3,529,845.38. The Gilbert Creek bill is composed of $1,917.55 for overhead; $15,803.28 for hired labor; and payments to two contractors in the amount of $615,656.58.
[14] See file 4 of the exhibits to the State's Supplemental Response to the United States' Interrogatories.
[15] Ibid, n.12.